**John KELLY, Jr., Plaintiff–Appellee,**

v.

**Steven CURTIS; Julie M. Gibson; J.R. Moore; Chatham County, GA, Defendants–Appellants.**

No. 92–8791.

United States Court of Appeals, Eleventh Circuit.

June 8, 1994.

Albert E. Clark, Linnie L. Darden, III, Savannah, GA, for defendants-appellants.

David Roberson, Randall A. Schmidt, Roberson & Schmidt, Savannah, GA, for plaintiff-appellee.

Before DUBINA and CARNES, Circuit Judges, and MORGAN, Senior Circuit Judge.

CARNES, Circuit Judge:

John Kelly spent a year in jail awaiting trial on charges that were eventually dropped. After his release, Kelly sued Chatham County, Georgia, and three of its police detectives who had been involved in his arrest. In factual terms, Kelly accused the detectives of concealing exculpatory evidence and of presenting false testimony, thereby causing his lengthy incarceration; he charged the County with failing to establish adequate procedures for conveying exculpatory evidence and with customarily seeking arrest warrants on the basis of affidavits that failed to show probable cause. In legal terms, Kelly charged the defendants with federal civil rights violations under 42 U.S.C. § 1983, and with false imprisonment and malicious prosecution in violation of state law. The defendants moved for summary judgment on grounds of qualified immunity and on the merits. For the most part, the district court denied these motions, although it granted summary judgment for the detectives on Kelly's section 1983 false arrest claim.

In this interlocutory appeal, we review some of the district court's grounds for denying summary judgment, and hold that: summary judgment should have been granted to two of the detectives on all of the federal claims and to the third detective on some of the federal claims; summary judgment should have been granted to the same two detectives on one of the pendent state law claims; and summary judgment was properly denied on the defendants' contention that Kelly could not prove any damages resulting from their alleged conduct.

## I. BACKGROUND

### A. FACTS

In reviewing the denial of a defendant's summary judgment motion, we are required to view the facts—which are taken from the pleadings, interrogatory responses, affidavits, and deposition—in the light most favorable to the plaintiffs. *Swint v. City of Wadley,* 5 F.3d 1435, 1439 (11th Cir.1993), *modified,* 11 F.3d 1030 (11th Cir.1994), *petition for cert. filed,* 62 U.S.L.W. 3707 (U.S. Apr. 18, 1994) (Nos. 93–1636, 93–1638); *cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (discussing types of evidence that are relevant to summary judgment). "Thus, what we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motions" are "the facts for present purposes," but they "may not be the actual facts." *Swint,* 5 F.3d at 1439. For that reason, a defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion for a judgment as a matter of law. *See Adams v. St. Lucie*

*County Sheriff's Dep't,* 962 F.2d 1563, 1579 n. 8 (11th Cir.1992) (Edmondson, J., dissenting) (dictum); *id.* at 1567 n. 2 (non-majority opinion of Hatchett, J.) (dictum), *rev'd per curiam on other grounds,* 998 F.2d 923, 923 (11th Cir.1993) (en banc).[1] Moreover, a district court can, "when needed, . . . use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified-immunity question." *Id.; accord Stone v. Peacock,* 968 F.2d 1163, 1166 (11th Cir.1992) (per curiam) (dictum). What we decide in this interlocutory appeal is only whether the district court should have granted *summary judgment* on qualified immunity grounds.

This case stems from a drug investigation by the Chatham County Metro Drug Squad. It began on August 14, 1989, when undercover detective Steven Curtis, a member of the Metro Drug Squad, bought "crack" cocaine from a man who answered the door at 4108 Boyd Street in Savannah, Georgia. The following afternoon, on August 15, Metro Drug detective Julie Gibson secured a warrant to search the Boyd Street residence. In support of her warrant application, detective Gibson offered her own affidavit stating that detective Curtis had bought cocaine at that address from an unknown black male, six feet tall, weighing about 200 pounds, approximately twenty years old, with medium brown hair worn in an afro.

That evening, detective Gibson, fellow Metro Drug detective J.R. Moore, and several other officers searched the Boyd Street home pursuant to the search warrant. Inside they found a rock-like substance that field tested positive for cocaine. Among those present in the house were two black men, including John Kelly. A third black man, who returned to the house during the search, told the officers that he lived there. All three men were arrested for possession of cocaine, and the police also charged John Kelly with selling cocaine. Gibson's report says that detective Curtis identified Kelly as the man from whom Curtis had purchased cocaine the

day before. However, according to Kelly, he had never seen detective Curtis before his arrest.

The record does not indicate which of the detectives arrested Kelly, although all were present and the arrest may have been made by several officers. Detective Moore read Kelly his rights after he was taken to the police station. Detective Gibson was assigned the case and wrote the incident report.

Kelly did not perfectly match the description in detective Gibson's search warrant application of the person who had sold detective Curtis cocaine. When arrested, Kelly was 42 years old, not 20, and did not wear his hair in an afro. In other respects—height, build, and race—Kelly did match detective Curtis' description of the person from whom he had bought cocaine at the Boyd Street address on the day before Kelly's arrest.

On August 16, 1989, the morning following Kelly's arrest, Kelly was taken before a magistrate. Detective Moore read the charges against Kelly. However, evidence of probable cause was not presented. The magistrate neither scheduled a commitment hearing nor set bail. (Under Georgia law, only a superior court judge may set bail for someone accused of selling cocaine. *See* O.C.G.A. § 17–6–1(a)(8) (Michie 1990 & Supp.1993)). There is no evidence to suggest what else, if anything, happened at the August 16, 1989, proceeding.

On August 17, 1989, two days after Kelly's arrest, detective Gibson took the rock-like substance that had been found in Kelly's home to the state crime lab for testing. On August 24, the state crime lab issued a written report stating that the substance found in Kelly's house on August 15 was "negative for common drugs of abuse." (A separate written report issued on the same date stated that the substance sold to detective Curtis on August 14 *was* cocaine.) The state crime laboratory *generally* sends a copy of its reports to the district attorney and the police

---

1. The en banc Court reversed the *Adams* panel's denial of summary judgment "[o]n the reasoning set out in the dissenting opinion of Judge Edmondson," *Adams v. St. Lucie County Sheriff's Dep't,* 998 F.2d 923, 923 (11th Cir.1993) (en banc) (per curiam), but did not address any issue involving the continuing power of a district court to decide qualified immunity matters after a summary judgment motion on that ground has been denied.

department at the same time.[2] On each report is a listing of who receives a copy of the report; the report in this case listed detective Gibson, the Metro Drug Squad, and the district attorney's office. Despite all of this, the district attorney's office did *not* receive the exculpatory report until months later. There is no evidence that any of the detectives had reason to know of this lapse, however.

The police department received the negative lab report on August 24, 1989. Although Kelly contends that detectives Curtis or Moore may have then seen that report, he has introduced no evidence to support his hypothesis. Gibson, however, did receive a copy of the report on August 25, 1989.[3]

The same day that the state crime lab released its negative drug report, a superior court judge set Kelly's bail on the cocaine possession and cocaine distribution charges at $5000. The record does not indicate what if any testimony or evidence was introduced when the judge set bail. Kelly did not make his bail.

On September 12, 1989—a month after Kelly's arrest and while he was still incarcer-ated—Gibson applied to a magistrate for arrest warrants against Kelly on both the possession and distribution charges. No evidence of probable cause was presented at the warrant hearing. Instead, in support of the cocaine possession arrest warrant, Gibson swore out a conclusory affidavit stating: "John Kelly, Jr., did commit the offense of Possession of Controlled Substance (Cocaine), in violation of Georgia State Code 16–13–39(b) at 4108 Boyd St., Savannah, Chatham County, GA in said county on or about 15th day of August, 1989." Gibson failed to disclose to anyone that the state crime lab had determined that the substance she charged Kelly with possessing on August 15 was not cocaine. Based on Gibson's affidavit,[4] the judge issued arrest warrants against Kelly on both the possession and distribution charges.[5]

On October 5, 1989, Kelly finally received a probable cause hearing, at which only detective Moore testified. Moore did not disclose the exculpatory crime lab results but instead stated that no lab report had been received. In addition, Moore failed to point out the discrepancies between Kelly's physical char-

---

2. Kelly has at times contended that the crime lab does not send a copy of its reports directly to the district attorney's office. However, in his brief to this Court, Kelly concedes that "[t]he state crime laboratory *generally* sends a copy of its report(s) to the district attorney and the police department at the same time."

3. Gibson now denies having received the report. However, an interrogatory response signed by Gibson's attorney admitted that Gibson received the report on August 25, 1989. Gibson contends that this interrogatory response is inaccurate and was prepared by her attorney without consulting her. Gibson may introduce evidence to that effect at trial, for whatever it is worth; however, the interrogatory response can be introduced as evidence against her. *Cf. Great Am. Indem. Co. v. Rose,* 242 F.2d 269, 271–73 (5th Cir.1957) (holding, under Louisiana law, that a pleading prepared by a party's attorney can be introduced as evidence against that party). *See generally Greene v. United States,* 447 F.Supp. 885, 891 n. 2 (N.D.Ill.1978) (stating, in dicta, that " '[i]f the attorney does answer the interrogatories in his own name, the answers would bind the party on the same principle by which a party is bound by admissions or stipulations entered into by his attorney' " (quoting 8 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2172 n. 29 (1970))).

In any event, that interrogatory response is not the only evidence suggesting that Gibson received the report. Captain Tracy, of the County's police department, swore in an affidavit that the part of the lab report that lists the police department and the district attorney's office is the part of the report that lists recipients. Gibson's name appears immediately beside the listing of the police department, allowing a jury to infer that Gibson herself was a designated recipient. In addition, Gibson initially testified at deposition that she did not recall whether she had received the report; only later in the deposition did she deny receiving it. The actual facts about whether Gibson received the report can be established at trial.

4. There is some doubt as to whether Gibson also submitted an affidavit in support of the distribution warrant. On appeal, she claims that she did and that the distribution affidavit was presented to the district court. However, no such affidavit can be found in the record on appeal. Again, the true facts can be established at trial.

5. The district court stated that "[a]n arrest warrant was never obtained for the offense of selling a controlled substance." However, Kelly concedes on appeal that a warrant did issue on the distribution charge.

acteristics and the description that detective Curtis had given of the person from whom Curtis had bought cocaine. At the conclusion of the probable cause hearing, Kelly was held for trial on both the possession and distribution charges.

On November 1, 1989, a grand jury indicted Kelly for distribution of cocaine. Detective Curtis testified against Kelly before the grand jury, but the record does not otherwise reveal what his testimony was. Kelly was not indicted on the possession charge, although that charge was not dismissed until the following year. Instead, Kelly remained in jail awaiting trial, apparently on both of the charges, until August 1990. At that time, Kelly's court-appointed attorney filed a discovery motion and the County produced the state lab's exculpatory report. Two weeks later, the district attorney dropped all charges against Kelly and, one year after his arrest, Kelly was released. The district attorney's records list the following reasons for dropping charges:

> Conflict with witnesses. Defendant has been in jail for one year. Unavailability of other witnesses. Possibility of re-indictment on other charges. The case was Dead Docketed in open court on 8/27/90. Request dismissal of the above-cited warrant. The defendant was charged with possession of controlled substance. The substance was not a controlled substance.

In addition, Captain Tracy, of the Chatham County Police Department, stated in a memo to his chief that the assistant district attorney "placed [the distribution case] on [the] Dead Docket" in part "because the identification of the suspect [Kelly] was not made until the following day, and because of a lack of corroborating evidence."

## B. PROCEDURAL HISTORY

Kelly filed this lawsuit shortly after his release from jail. Count I charges detectives Curtis, Gibson, and Moore with intentionally depriving Kelly of rights protected by the Fourth and Fourteenth Amendments. Specifically, Kelly alleges that the detectives committed false arrest, malicious prosecution, and illegal detention, all of which are cognizable under 42 U.S.C. § 1983. Count II

charges that the policies and customs of the Chatham County Police Department contributed to the violation of Kelly's constitutional rights. Counts III and IV charge the detectives with the state-law torts of malicious prosecution and false imprisonment.

The detectives and the County moved for summary judgment on the merits as to all claims, and on qualified immunity grounds as to the federal claims against the detectives. The district court granted summary judgment on qualified immunity grounds to the detectives as to the section 1983 false arrest claim. The court concluded that the detectives initially had probable cause to arrest Kelly for possession of cocaine because the substance found at Kelly's house had, in the field, tested positive for cocaine; only later did the lab report reveal that the substance was *not* cocaine. The district court also ruled that the detectives were entitled to qualified immunity for arresting Kelly on the distribution charge because, based on detective Curtis' undercover cocaine buy the day before, reasonable officers could have believed that they had probable cause to arrest Kelly on that charge.

However, the district court denied summary judgment to the detectives on the section 1983 illegal detention claim. The court reasoned that "continued detention of a defendant after the police are aware of exculpatory evidence violates the due process clause." In essence, the district court held that the detectives had a legal obligation to insure that the judge or the district attorney were aware of all exculpatory evidence. Because the court believed that it was unclear whether the detectives knew of the exculpatory lab report or whether the district attorney had received the report, the court decided to send the section 1983 illegal detention claim to trial.

The district court also denied summary judgment to the detectives on the section 1983 malicious prosecution claim. The court noted that this Circuit has recognized a federal right to be free from "prosecutions procured by false and misleading information." *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988). The court reasoned that if detective Gibson received the exculpatory lab re-

port, "then a jury could infer that Gibson, and perhaps her fellow officers, misled the district attorney into believing probable cause existed by concealing the report." In addition, the district court concluded that a jury might be able to infer that, because Kelly did not match the description that Curtis initially gave of the person who had sold him cocaine, the detectives should have known and revealed that Kelly was not the person who had sold cocaine.

As to Count II, the district court denied summary judgment on the basis that Kelly had presented evidence that the County's policies and customs had caused violations of his constitutional rights. Finally, the district court denied summary judgment on the merits of the state law false imprisonment (Count III) and malicious prosecution (Count IV) claims.

■ The individual detectives and the County then filed this interlocutory appeal. We have jurisdiction over an interlocutory appeal from a denial of qualified immunity "'to the extent that [the denial] turns on an issue of law.'" *Swint v. City of Wadley*, 5 F.3d 1435, 1448 (11th Cir.1993) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)), *modified*, 11 F.3d 1030 (11th Cir.1994), *petition for cert. filed*, 62 U.S.L.W. 3707 (U.S. Apr. 18, 1994) (Nos. 93–1636, 93–1638). We have discretion to exercise pendant appellate jurisdiction over the remaining claims, but we are not required to do so. *Id.* at 1449–50.

## II.  DISCUSSION

### A.  QUALIFIED IMMUNITY

■ The detectives claim that they are entitled to summary judgment based on qualified immunity as to Kelly's section 1983 illegal detention and false arrest claims. Qualified immunity protects government officials performing discretionary functions from civil liability under federal law unless their conduct violates a "clearly established [federal] statutory or constitutional right[ ] of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396

(1982).  A plaintiff cannot rely on "'general, conclusory allegations' or 'broad legal truisms'" to show that a right is clearly established. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.1993) (quoting *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir.), cert. denied, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989), *modified*, 14 F.3d 583 (11th Cir.1994).  Instead, the plaintiff must show that, "when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)." *Post, Id.* at 1557.  "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.*  We review *de novo* the legal basis for a district court's denial of summary judgment on qualified immunity, viewing the facts in the light most favorable to the plaintiff. *Swint v. City of Wadley*, 5 F.3d 1435, 1439, 1441 (11th Cir. 1993), *modified*, 11 F.3d 1030 (11th Cir.1994), *petition for cert. filed*, 62 U.S.L.W. 3707 (U.S. Apr. 18, 1994) (Nos. 93–1636, 93–1638); *Bennett v. Parker*, 898 F.2d 1530, 1537 (11th Cir.1990) (Tjoflat, C.J., concurring), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991).

### 1.  Illegal Detention

The district court denied summary judgment on qualified immunity as to Kelly's section 1983 illegal detention claims. Kelly contends that the detectives failed to release him within a reasonable time after discovering that the substance in his possession was not cocaine. In response, the detectives argue that they were not liable once they turned the case over to the district attorney. Instead, they urge, it is the magistrates and prosecutors who are responsible for Kelly's long incarceration.

The district court rejected this defense, reasoning that the detectives might still be responsible for Kelly's continued incarceration if they had "deceived or unduly pressured the court officers into prosecuting Kelly." As a matter of general legal principle, the district court may be correct, *see Barts v. Joyner*, 865 F.2d 1187, 1195–96 (11th Cir. 1989), *cert. denied*, 493 U.S. 831, 110 S.Ct.

101, 107 L.Ed.2d 65 (1989); however, that principle is not wholly applicable to the facts of this case.

### a. Detectives Curtis and Moore

█ The district court erred in denying summary judgment to detectives Curtis and Moore on the section 1983 illegal detention claim. The district court correctly recognized that "[i]f the Defendants did not know of the lab reports and, therefore, did not intentionally mislead the judges and prosecutor, they could not be liable for Kelly's detention." Where the court erred, as to Curtis and Moore, was in its holding that the "question of when the report came to the attention of the detectives ... presents a material issue of fact, which the jury must decide." Kelly presented no evidence whatsoever that the report in question *ever* "came to the attention" of Curtis and Moore.

Absent any evidence at all that Curtis and Moore knew of the report, Kelly offers two arguments in support of keeping those two detectives in the case insofar as the illegal detention claim is concerned. First, Kelly contends that "[t]he district court was not obligated to separately analyze the conduct of Curtis and Moore"—separately, that is, from Gibson, who did receive the report. There is no authority for imputing to those two detectives the knowledge and alleged culpability of another detective; the law did not then, and does not now, clearly establish such vicarious co-employee liability. We reject Kelly's unprecedented argument.

Second, Kelly argues that Curtis' and Moore's lack of knowledge about the report is not dispositive, because "[a] reasonably well-trained police officer would have tried to locate the lab report." The question, of course, is not what a reasonably well-trained officer would have done. Instead, the question is whether Curtis and Moore violated Kelly's clearly established constitutional rights by failing to look for the report. None of the cases to which Kelly points establish

such a right. *Olson v. Tyler,* 825 F.2d 1116, 1121 (7th Cir.1987), states that an officer seeking an arrest warrant may not withhold relevant, exculpatory evidence of which the officer is aware. *Stewart v. Donges,* 915 F.2d 572, 581–83 (10th Cir.1990), stands for the same proposition; in that case, a police officer seeking an arrest warrant withheld evidence that undermined the credibility of his informant. Neither case even hints that an officer has an affirmative obligation to seek out exculpatory information of which the officer is *not* aware.[6]

*Tillman v. Coley,* 886 F.2d 317 (11th Cir. 1989), does not clearly establish a right to have an officer seek out exculpatory evidence in these circumstances, either. In *Tillman,* we held that qualified immunity did not protect the defendant police officer. More specifically, we decided that when an officer has "serious doubts" regarding a suspect's identity, "no reasonable law enforcement officer may conclude that an arrest warrant may be obtained and an arrest made for the sole purpose of identifying [that] suspect." *Id.* at 321. This case does not involve an arrest made solely for identification purposes, and there is no evidence that Curtis and Moore had any serious doubts about whether Kelly was the person who had committed the alleged crime.

Nor is Kelly's position supported by *Whirl v. Kern,* 407 F.2d 781 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). In that case, a sheriff's office received notice that the district attorney had dropped all charges against a particular detainee for lack of evidence. *Id.* at 786. The sheriff neglected to process the dismissal, leaving the innocent detainee languishing in jail. We held that the sheriff himself was liable for false imprisonment under a theory of "constructive notice." *Id.* at 792–93. However, *Whirl* does not require police officers to track down every lead; it merely holds that they cannot negligently ignore a

---

6. By distinguishing these two out-of-circuit decisions that Kelly has cited, we do not mean to imply that the law can be clearly established for qualified immunity purposes by non-binding precedent. *See Hansen v. Soldenwagner,* 19 F.3d 573, 578 n. 6 (11th Cir.1994) ("[T]he case law of one other circuit cannot settle the law in this circuit to the point of it being 'clearly established.' "). Even if out-of-circuit decisions could clearly establish the law in this Circuit, a distinguishable, non-binding case does not clearly establish anything.

**1552**

notice specifically sent to them requiring that a detainee be released. Curtis and Moore did not receive such notice in this case.

Curtis and Moore had neither actual knowledge of the report nor a clearly established duty to ferret it out. Accordingly, qualified immunity protects them from Kelly's theory that they had an affirmative duty to disclose the report.

### b. Detective Gibson

Although Gibson did receive the exculpatory report, she did not, on the facts of this case, have a clearly established duty to bring that report to the attention of the prosecutor or the state court. In holding that Gibson had such a duty, the district court relied in large part on *Sanders v. English,* 950 F.2d 1152, 1163–64 (5th Cir.1992). *English* was decided by another circuit more than two years *after* Kelly's incarceration, and does not purport to decide what rights were clearly established prior to its date of publication; therefore, it does not support Kelly's position on the qualified immunity issue. Even if *English* had been decided by this Court and before Kelly's arrest, it involved facts materially dissimilar from those of the present situation. There, a police officer withheld exculpatory information that a reasonable officer would not have expected the district attorney to get from another source. *See id.* at 1156–58, 1162. Here, by contrast, Gibson had every reason to think that the district attorney's office already knew about the exculpatory report. The report itself listed the district attorney's office as a recipient. Moreover, the state lab had a general practice of sending a copy of its results directly to the prosecutor. *English* simply does not deal with a situation in which an officer fails to turn over to the prosecutor evidence she has reason to believe that the prosecutor already has.

The district court also relied on *Gay v. Wall,* 761 F.2d 175, 178–79 (4th Cir.1985), and *Powe v. City of Chicago,* 664 F.2d 639, 651–52 (7th Cir.1981). Those cases did not involve failure to turn over exculpatory evidence. Instead, *Gay* and *Powe* stand for the proposition that a police officer may be liable for failing to release a detainee, held by that

officer, after the officer discovers that the detainee is innocent of all charges. That rule cannot apply to Gibson because the exculpatory lab report would not necessarily have led her to think that Kelly was innocent of *all* charges and therefore due to be released. According to Gibson, Curtis identified Kelly as the person who had sold Curtis cocaine on August 14, 1989, and the state lab later confirmed that the substance sold was cocaine. Even if Curtis' identification of Kelly as that person eventually turned out to be *wrong,* there is no evidence that the identification *never happened.* On the strength of Curtis' identification—whether right or wrong—the police had probable cause to detain Kelly on the distribution charge even after the flaw in the possession charge became clear. Thus, *Gay* and *Powe* are inapposite for purposes of the present qualified immunity inquiry. *See also,* n. 6, above.

What is missing from Kelly's attempt to pierce Gibson's qualified immunity defense is a decision clearly establishing a federal statutory or constitutional duty on the part of a law enforcement officer to inform the prosecutor's office of exculpatory evidence that the officer has reason to believe is already known to that office. No such duty can be drawn from the case law in existence at the time of these events, nor can it even be drawn from case law in existence now.

The same is true of any failure of an officer to inform defense counsel or the court of exculpatory evidence: the officer has no such duty where she has reason to believe that the prosecutor is aware of that evidence. The Constitution places the duty to disclose known exculpatory evidence upon prosecutors. *E.g., Brady v. Maryland,* 373 U.S. 83, 86–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). It imposes no obligation upon law enforcement officers to second guess prosecutors about whether evidence known to them is exculpatory. The district court should have granted summary judgment to detective Gibson on qualified immunity grounds insofar as the illegal detention claim is concerned.

### c. Conclusion

In summary, we reject the district court's conclusion that the detectives had an affirma-

tive duty to make the district attorney aware of the exculpatory lab report. First, there is no evidence Curtis and Moore ever saw the report, and they had no clearly established duty to ferret it out. Second, although Gibson did receive the report, neither Kelly nor the district court points to any case that clearly established that a police officer must turn over exculpatory evidence to a prosecutor when that officer has reason to believe that the prosecutor already has the evidence. Kelly's contention that the officer must turn over evidence to the court or defense counsel, even when the officer has reason to believe that that evidence is known to the prosecutor, has even less support in precedent. Therefore, all of the detectives are entitled to qualified immunity on the section 1983 illegal detention claim.

## 2. Malicious Prosecution

a. Failure to Point Out the Discrepancy Between Kelly's Appearance and the Description in Gibson's Search Warrant Affidavit of the Person Who Sold Curtis Cocaine

■ In denying qualified immunity on the section 1983 malicious prosecution theory, the district court reasoned that the detectives may have misled the prosecutor or the state court by failing to mention that Kelly did not match exactly the description of the person who had sold Curtis cocaine. We disagree.

Curtis' description of the person who sold him cocaine was contained in Gibson's search warrant affidavit. That affidavit was part of the state court's case file, which was fully open to defense counsel and the court. Thus, the information the detectives allegedly "withheld" was information already before defense counsel and the court. It may be that Kelly's defense counsel neglected to inspect the court's records or to draw the court's attention to this evidence. If so, Kelly's complaint is with his former counsel, not with the detectives. Kelly has not pointed us to any case holding that a defendant has a right to have a law enforcement officer direct defense counsel or the court to information on a search warrant contained in the official court file. Therefore, the district court

should have granted qualified immunity summary judgment on this claim.

b. Alleged Active Deception by the Detectives

Kelly also argues that the detectives *actively* misled the superior court. In support of this argument, Kelly asserts: (1) that after receiving the exculpatory lab report, detective Gibson submitted a facially inadequate arrest warrant in which she falsely averred that Kelly had possessed cocaine when she had no evidence to support that averment; (2) that detective Moore lied to the superior court—or at least recklessly disregarded the truth—by testifying at Kelly's probable cause hearing that no lab report had been received; and (3) that detective Curtis deceived the grand jury that indicted Kelly on the distribution charge.

■ Kelly's claim that Curtis misled the grand jury is factually and legally meritless. Not only is there no evidence that Curtis misled the grand jury, but this Court has held that testimony before a grand jury is protected by absolute immunity. *Strength v. Hubert,* 854 F.2d 421, 424–25 (11th Cir.1988). Accordingly, the district court should have granted Curtis summary judgment on the malicious prosecution claim on qualified immunity grounds as well as on the basis of a grand-jury witness' absolute immunity.

However, Kelly's allegations that Gibson and Moore actively deceived the state court merit closer attention. The United States Supreme Court has held that qualified immunity does not protect an officer who seeks a warrant where "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); *cf. Strength,* 854 F.2d at 426 & n. 5 (recognizing that "freedom from malicious prosecution is a federal right protected by § 1983"); *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963) (holding officers liable under section 1983 for making an arrest without probable cause), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964). *See generally Albright*

*v. Oliver,* —— U.S. ——, —— n. 5, 114 S.Ct. 807, 811 n. 5, 127 L.Ed.2d 114 (1994) (plurality opinion of Rehnquist, C.J.) (collecting federal cases on malicious prosecution).

The Supreme Court has also held that the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant. *See Franks v. Delaware,* 438 U.S. 154, 156, 165–71, 98 S.Ct. 2674, 2676, 2681–84, 57 L.Ed.2d 667 (1978). Although *Franks* involved a *search* warrant, we have applied its rule in a case challenging a search made pursuant to an improperly obtained *arrest* warrant. *See United States v. Martin,* 615 F.2d 318, 327–29 (5th Cir. 1980). At the same time, we have explicitly limited the *Franks* rule to cases of perjurious or recklessly false statements or omissions made by a police officer in support of a warrant; the rule does not apply to *negligent* misrepresentations or omissions. *See, e.g., West Point–Pepperell, Inc. v. Donovan,* 689 F.2d 950, 959 (11th Cir.1982); *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980); *United States v. Astroff,* 578 F.2d 133, 136 (5th Cir.1978) (en banc).

■ At the probable cause hearing, Moore testified that the police department had not received the state crime lab's test results, despite the fact that the police department had received the exculpatory report more than a month earlier. However, there is no evidence that Moore then knew that the report had been received or that his testimony was intentionally false. *Franks* held that a police officer violates the Constitution by obtaining a warrant based on perjurious or recklessly false testimony, and Kelly argues that Moore violated his rights in that respect. Because there is no evidence Moore knew of the report, there is also no evidence that Moore perjured himself. If Moore violated *Franks,* it was only by offering false testimony in reckless disregard for the truth. Therefore, to succeed on his section 1983 malicious prosecution claim against Moore, Kelly must prove that a reasonable police officer would have known that Moore's testimony was not just negligently false, but recklessly so. *Cf. West Point–Pepperell,* 689 F.2d at 959 (holding that a warrant is invalid if it was based on a police officer's recklessly false misstatements and omissions, but not if based on merely negligently false misstatements and omissions).

Qualified immunity almost always protects a defendant when "case law, in factual terms, has not staked out a bright line." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994). Unfortunately for Kelly, the difference between "reckless" and merely "negligent" disregard for the truth is not crystal clear; we have not staked out a bright line. For example, in *United States v. Astroff,* 578 F.2d 133, 134–35 (5th Cir.1978) (en banc), we held that a police officer was merely negligent when he averred, in support of an arrest warrant, that an inspection "revealed a green vegetable substance which appeared to be" marijuana when the officers actually had only *smelled* the marijuana. In *LeSavage v. White,* 755 F.2d 814, 820 (11th Cir.1985), we held that a police officer "was at most negligen[t]" when he failed to get an exculpatory report from a fellow officer before seeking an arrest warrant. In light of these cases, a reasonable officer might not have known that he was acting recklessly, rather than negligently, in asserting without investigation that no lab report had been received. Therefore, Moore is protected by qualified immunity from this theory of recovery.

■ By contrast, Gibson obtained an arrest warrant on the strength of her sworn statement that Kelly had committed the offense of cocaine possession. When Gibson swore out the affidavit, the facts (for summary judgment purposes) are that Gibson knew that the substance Kelly had possessed was not cocaine. Kelly contends that Gibson thereby violated a clearly established duty not to seek a warrant on the basis of perjured testimony. We agree. Under *Franks,* a police officer violates the Constitution if, in order to obtain a warrant, she perjures herself or testifies in reckless disregard of the truth. As the *Franks* Court explained,

> "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." ...

This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay ... as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks v. Delaware,* 438 U.S. 154, 165–66, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978) (quoting *United States v. Halsey,* 257 F.Supp. 1002, 1005 (S.D.N.Y.1966)). If Gibson knew of the contents of the lab report—and for present purposes we must assume that she did—then the information she swore to in the affidavit was not "believed or appropriately accepted by the affiant as true." [7]  *Id.* Her affirmative misstatement violates *Franks.* Accordingly, Gibson is not protected by qualified immunity from Kelly's section 1983 malicious prosecution claim.

Kelly also contends that Gibson is liable because she sought an arrest warrant based on an affidavit that contained no evidence of probable cause. In *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986), the Supreme Court held that qualified immunity does not protect an officer who seeks a warrant on the basis of an affidavit that does not show reasonably objective probable cause—even if the magistrate erroneously issues the warrant. According to *Briggs,* the determinative question:

is whether a reasonably well-trained officer ... would have known that [her] affidavit failed to establish probable cause and that [she] should not have applied for a warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.

*Id.* at 344, 106 S.Ct. at 1098 (footnote omitted). Subsequently, in *Garmon v. Lumpkin County,* 878 F.2d 1406, 1408 (11th Cir.1989),

we applied *Briggs* to a situation in which an officer sought a warrant to arrest Garmon based on an affidavit stating that Garmon "did ... commit the offense of false report of a crime." We held that the officer had violated the Constitution by seeking the warrant, because "[s]uch a conclusory affidavit clearly is insufficient to establish probable cause. The affidavit contains neither information providing the basis for the affiant's belief nor any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime." *Id.* at 1408–09 (citation omitted).

Gibson's warrant is materially similar to the one we held facially unconstitutional in *Garmon,* shortly before Kelly's arrest. Her affidavit articulates neither the basis for her belief that Kelly violated the law nor any affirmative allegation that she had personal knowledge of the circumstances of Kelly's alleged crime. By seeking an arrest warrant on the basis of such a conclusory affidavit, Gibson appears to have violated a clearly established constitutional right of Kelly.[8]

## B. PENDENT CLAIMS AGAINST CURTIS AND MOORE

 We may, in our discretion, exercise pendent appellate jurisdiction over an otherwise nonappealable district court decision, if we already have jurisdiction over another issue in the same case. *Swint v. City of Wadley,* 5 F.3d 1435, 1449 (11th Cir.1993), *modified,* 11 F.3d 1030 (11th Cir. 1994), *petition for cert. filed,* 62 U.S.L.W. 3707 (U.S. Apr. 18, 1994) (Nos. 93–1636, 93–1638). We choose to exercise pendent jurisdiction over those state law claims against detectives Curtis and Moore that we can decide on the basis of the record and briefs before us. "If [Curtis and Moore are] correct about the merits in [their] appeal, reviewing the district court's order [will] put an end to the entire case against [them] ...."

---

7. Gibson has not even suggested that she had any reason to question the accuracy of the lab report.

8. It is possible that, on remand, Gibson will produce evidence showing that she did in fact present evidence of probable cause to the magis-

trate. *See Garmon,* 878 F.2d at 1409 n. 1. However, she is not entitled to qualified immunity on the section 1983 malicious prosecution claim under the facts as they are presently articulated for purposes of this appeal.

*Id.* at 1450. That is the judicial economy reason for exercising pendent appellate jurisdiction, but there is another important consideration that calls for reviewing the denial of summary judgment as to other claims against these two defendants. We have already held that they, unlike Gibson, are entitled to summary judgment on qualified immunity grounds as to each of the federal claims against them. All that remain pending against them are the state law claims.[9] If we were to refuse to exercise pendent jurisdiction over those state law claims, our refusal could result in a situation much like that which the qualified immunity doctrine is designed to prevent. A principal purpose of qualified immunity is to protect officials from needless litigation, which diverts official energies, deters able citizens from public service, and " 'dampen[s] the ardor of all but the most resolute, or the most irresponsible [public officials] from the unflinching discharge of their duties.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)) (second brackets in original).

Detectives Curtis and Moore were brought into federal court on the basis of federal claims, which we have held are now out of the case insofar as Curtis and Moore are concerned. If these two defendants are also entitled to summary judgment on the state law claims, then by declining to exercise our discretionary pendent appellate jurisdiction, we might undermine the purpose of permitting an interlocutory appeal from the denial of summary judgment on qualified immunity grounds. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if the case is erroneously permitted to go to trial."). We do not hold that a court of appeals should always exercise pendent appellate jurisdiction over the state law claims against a defendant once it has held that that defendant is entitled to summary judgment on qualified immunity

grounds as to all the federal claims. We do, however, recognize such a situation as a special one that may warrant the exercise of our discretion to review.

### 1. Malicious Prosecution

Kelly contends that Curtis and Moore maliciously prosecuted him under Georgia law. The Georgia tort of malicious prosecution has the following elements: (1) prosecution for a criminal offense; (2) under a valid warrant or accusation or summons; (3) termination of the prosecution in favor of the plaintiff; (4) malice in the institution and maintenance of the proceedings; (5) lack of probable cause for the proceedings; and (6) damage to the plaintiff. *Commercial Plastics & Supply Corp. v. Molen,* 355 S.E.2d 86, 87 (Ga.App.1987). The district court found that Kelly had presented enough evidence to survive summary judgment on the *federal* malicious prosecution claim, and "[t]he same legal analysis applies to the claims under state tort law."

Curtis and Moore contend that Kelly failed to introduce any evidence that they acted with malice or without probable cause. Kelly does not specifically respond to this argument, but relies on the district court's terse reasoning, which is flawed. As previously discussed, Kelly introduced no evidence that Curtis and Moore ever learned of the exculpatory lab report. Therefore, Kelly has introduced no evidence from which a jury could infer that Curtis and Moore acted with malice; summary judgment should have been granted to Curtis and Moore on Kelly's state law malicious prosecution claim.

### 2. False Imprisonment

Under Georgia law, "[f]alse imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51–7–20 (Michie 1982). Unfortunately, the record and briefs are not such that we can review with confidence the district court's decision denying Curtis and Moore summary judgment as to the false

---

**9.** Under 28 U.S.C.A. § 1367 (1993), the district court may exercise supplemental jurisdiction

over the remaining state law claims against Curtis and Moore.

imprisonment claim. Accordingly, we decline to exercise our pendent appellate jurisdiction over it.

### C. DAMAGES

The defendants, including detectives Curtis and Moore, contend that they are due summary judgment on all claims because Kelly sustained no injuries from his incarceration on the possession charge. In support of this contention, they point out that they had probable cause to arrest Kelly on the distribution charge, and that Kelly was eventually indicted on that charge, not on the possession charge. The defendants are partially correct.

In *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989), we rejected a section 1983 plaintiff's contention that she was entitled to damages against two deputy sheriffs for "her criminal trials, conviction, incarceration, and the resulting aggravation of her Rape Trauma Syndrome." We held that "[t]he intervening acts of the prosecutor, grand jury, judge and jury ... each break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policeman." *Id.* The same principle applies here.

In order to receive compensatory damages, Kelly must show that he suffered an injury because of the defendants' allegedly illegal or tortious acts. For example, Kelly could show both that the defendants were responsible for his continued incarceration on the possession charge and that, if the possession charge had been dismissed earlier, his bail would have been reduced to an amount he could have posted. However, absent proof of a specific, actual injury caused by the defendants' conduct, Kelly is not entitled to compensatory damages. Kelly cannot recover such damages merely by showing that he was incarcerated on one illegitimate charge; he would also have to show that, but for that illegitimate charge, he would have been released.

Nevertheless, a failure by Kelly to show such an actual injury would not necessarily entitle the defendants to summary judgment on the damages issue. When constitutional rights are violated, a plaintiff may recover *nominal* damages even though he suffers no compensable injury. *E.g., Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978). In addition, in some circumstances, "[p]unitive damages may be awarded in a § 1983 action even without a showing of actual loss by the plaintiff if the plaintiff's constitutional rights have been violated. *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir.1980)." *Dykes v. Hosemann*, 743 F.2d 1488, 1500 (11th Cir.1984), *rev'd per curiam in part on other grounds*, 776 F.2d 942 (11th Cir.1985) (en banc), *reinstated per curiam in part*, 783 F.2d 1000, 1000 (11th Cir.), *cert. denied*, 479 U.S. 983, 107 S.Ct. 569, 93 L.Ed.2d 574 (1986). Accordingly, we hold that the defendants are not entitled to summary judgment on their argument that Kelly cannot recover any damages from them.

### III. CONCLUSION

We REVERSE the denial of summary judgment for detective, Curtis and Moore as to all of the federal claims and as to the state law malicious prosecution claim. We REVERSE the denial of summary judgment for Gibson on all of the federal claims, except for that portion of the malicious prosecution claim specified in Part II.A.2.b of this opinion; as to that part of the malicious prosecution claim, we AFFIRM the denial of summary judgment. We AFFIRM the denial of summary judgment as to all of the defendants on their theory that Kelly cannot recover any damages—even nominal or punitive damages—from them.

We decline to exercise our pendent appellate jurisdiction as to any of the other issues in the case and intimate no view as to the merits of those issues.