[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14927
_____

D.C. Docket No. 9:10-cv-80077-WJZ


JAMES M. DANIELS,

Plaintiff - Appellee,

versus

JOHN BANGO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 20, 2012)

Before WILSON, PRYOR and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

James M. Daniels spent eight months in jail for a crime he did not commit.

He was released from pretrial custody upon his acquittal at a bench trial on charges that he sold crack cocaine to Palm Beach County Deputy Sheriff John Bango, who was working undercover in Boynton Beach, Florida.  As it turned out, the dealer was actually someone else.  Bango misidentified Daniels as the dealer even though Bango spent about twenty minutes with the dealer during the transaction.  After his acquittal, Daniels sued Bango, contending that Bango violated his civil rights under 42 U.S.C. § 1983 by making false statements in the affidavit that supported probable cause for Daniels's arrest warrant and omitting material facts.  He also included a Florida state-law claim for malicious prosecution.  This appeal is from the denial of Bango's motion for summary judgment asserting qualified immunity.  We affirm in part and dismiss in part.

## I. Facts

We take the facts from the magistrate judge's report and recommendation, adopted by the district judge, and fully supported by the record[1]:

> On July 26, 2007, Defendant John Bango . . . and his partner, Agent Thomas Kabis, were working undercover in Boynton Beach, purchsing narcotics from street-level drug dealers.  While making these purchases, Bango and Kabis drove an unmarked vehicle that

---

[1] The district court correctly viewed the facts in the light most favorable to Daniels.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The district court also noted that "[w]ith few exceptions noted herein, the parties do not dispute the relevant facts.  Rather, the parties' disagreement focuses on the legal significance of these facts."  D.E. 41 at 1 n.1.

2

was equipped with a hidden surveillance camera.  Shortly after 3:00 p.m., the officers purchased forty dollars' worth of crack cocaine from a young black male.  The suspect referred to himself as "Toe" or "Tobe," and he later told the officers that his first name was James.[2]  During part of the exchange, the suspect rode in the front seat of the officers' car.  While in the car, the suspect informed the officers that he "just got out of jail last night," that he "went to court today," and that he was "facing fifteen years" for "burglary with a firearm and robbery with a firearm."  He also mentioned that he had been arrested in a nearby area.  During the officers' encounter with the suspect, which lasted about twenty minutes and took place on a clear day, they observed him at close range, and he did not try to conceal his face.[3]

Later that day, Bango and Kabis returned to their office and sought to determine the identity of the suspect who had sold them crack cocaine.  Bango watched the first part of the surveillance tape and printed some still photographs of the suspect.  Bango then searched the Sheriff's Office's online "booking blotter" for a black male named James who had been arrested by the Boynton Beach Police Department for burglary within the last three months.  Although the booking blotter allows searches for arrests that occurred up to one year in the past, Bango limited the time frame of his search to three months because the suspect had "said he had just gotten out of jail," and Bango "figured three months would have caught anything."  Bango later acknowledged, however, that a suspect charged with burglary "absolutely" could have been incarcerated for more than ninety days and therefore could have been excluded from Bango's search, even if the suspect had recently been released.[4]  Bango's

---

[2] The surveillance recording stopped before the end of the transaction because the camera ran out of videotape.  The suspect disclosed that his name was James after the recording ended.

[3] Normally, when the undercover officers left the presence of a drug suspect, they would describe the suspect's physical traits out loud so that those descriptions would be recorded by the surveillance tape.  Though the officers stated that they followed this practice for the suspect at issue here, the surveillance tape had already run out.  Thus, the officers' descriptions of the suspect were lost.

[4] The booking blotter permits searches based on the date of a suspect's booking but does

3

search revealed Plaintiff James Daniels, who had been charged on June 26, 2007, with burglary and petit theft; sentenced to time served on July 23, 2007; and released from the Palm Beach County Jail on July 24, 2007, with his case over.  After examining Daniels's booking-blotter photo, Bango identified Daniels as the individual who had sold narcotics to Bango and Kabis earlier that day.

Kabis separately searched the booking blotter, "filter[ing] the search by the agency that made the arrests, the charge that was used to make the arrest and the name James."  Kabis does not recall what time frame he used for the search.  Kabis's search also identified Daniels, and Kabis agreed that Daniels was the suspect who had sold the officers drugs.

Bango then prepared a probable-cause affidavit to support Daniels's arrest for selling cocaine.  The affidavit mainly described the details of the officers' drug purchase from the suspect.  Near the end of the affidavit, Bango stated that the suspect had told the officers that "his real first name was James and he had just gotten out [of] the Palm Beach County Jail for burglary."  Bango further stated that the officers had used the booking blotter to "locate[] the subject and confirm[] that his name was James Daniels."  The affidavit did not note the discrepancies between the suspect's statements and Daniels's record—namely, that (1) the suspect had stated that he "just got out of jail last night [July 25, 2007]," while Daniels had been released on July 24, 2007; (2) the suspect had indicated that he "went to court today [July 26, 2007]," while Daniels's case had concluded two days earlier; and (3) the suspect had said that he was "facing fifteen years" for "burglary with a firearm and robbery with a firearm," while Daniels's case had been resolved two days before with time served.

Bango provided the affidavit, along with the video, photographs of the suspect and Daniels, and other investigation materials, to an assistant state attorney for review.  *See* D.E. 20 at 4, ¶ 9; D.E. 28 at 3, ¶ 9.  Bango subsequently presented an arrest-warrant application to a

---

not allow searches based on the date of the suspect's release from jail.  However, a completed search query lists the date and time of release for each person identified in the search results.

4

Palm Beach County Circuit Judge.[5]  On August 10, 2007, the judge issued a warrant for Daniels's arrest on the charge of selling cocaine within 1,000 feet of a place of worship or a convenience business. The arrest warrant set a bond of $50,000.

Daniels was arrested on October 13, 2007.[6]  He remained in custody for eight months while awaiting trial.  While incarcerated, Daniels, who had been shown the surveillance videotape, asked other inmates whether they knew anyone from Boynton Beach who went by the name "Toe" or "Tobe."  One inmate said that he did know someone by that name but did not know the person's real name. However, the inmate did know that "Toe" or "Tobe" had a sister whose last name was Reed.  Using this information and the suspect's disclosure that his first name was James, Daniels's attorneys discovered that a black male named James Reed had been released from the Palm Beach County Jail on the night of July 25, 2007 (the night before the drug transaction) and, on the morning of July 26, 2007, had returned to Palm Beach County Circuit Court for a non-custody arraignment on charges of burglary and petit theft.  Because Reed had been arrested on these charges on March 14, 2007—more than three months before Bango searched the booking blotter on July 26, 2007—Bango's search would not have identified Reed.[7]

---

[5] Bango asserts in his summary-judgment motion that the assistant state attorney, rather than Bango, submitted the warrant application.  But as Daniels points out in his response, *see* D.E. 28 at 4–5, ¶ 10, this assertion is refuted by Bango's deposition testimony, which indicates that he (and possibly Kabis) presented the warrant application to the judge.  *See* D.E. 20-1 at 99. ("We had done several buys and . . . we were putting packets together of arrestees for warrants. We would bring them over ten at a time to the State Attorney's Office.  Allow them to do their paperwork.  *We would then go see the judge*.  The judge would sign it.  We would take it and it would get held back." (emphasis added)).

[6] Although the warrant for Daniels's arrest was issued two months earlier, the processing and execution of the warrant were purposefully delayed to protect Bango's and Kabis's identities as undercover officers.

[7] It appears undisputed that if Bango had searched the booking blotter using a time period that included the date of Reed's arrest—for example, had Bango looked back six months rather than three—his search would have revealed Reed.

5

On June 15, 2008, Daniels was acquitted of the cocaine-sale charge following a bench trial. Apparently contrasting Daniels's appearance to photographs of the suspect, the presiding judge stated, "It does not look like that guy to me. The ears look different." The judge added, "I'm sorry. It doesn't look like him to me . . . the ears and the nose."

D.E. 41 at 1–5 (citations omitted).

## II. Jurisdiction

Generally, the denial of a motion for summary judgment is not a final order subject to immediate appeal. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). A denial of summary judgment on the basis that the defendant is not entitled to qualified immunity is immediately appealable when it "concerns solely the pure legal decision of (1) whether the implicated federal constitutional right was clearly established and (2) whether the alleged acts violated that law." *Koch v. Rugg*, 221 F.3d 1283, 1294 (11th Cir. 2000) (emphasis omitted) (citing *Johnson v. Jones*, 515 U.S. 304, 313, 115 S. Ct. 2151, 2156 (1995)). The appeal must present "a legal question concerning a clearly established federal right that can be decided apart from considering sufficiency of the evidence." *Id.* Here, Bango argues that his actions, which are undisputed, did not violate clearly established constitutional rights; therefore, we find the appeal of the district court's qualified immunity determination proper.

6

Bango contends that we have pendent jurisdiction to review the district court's denial of his motion for summary judgment on Daniels's claim for malicious prosecution. However, "pendent appellate jurisdiction is limited to questions that are 'inextricably interwoven' with an issue properly before the appellate court." *Harris v. Bd. of Educ.*, 105 F.3d 591, 594 (11th Cir. 1997) (per curiam) (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51, 115 S. Ct. 1203, 1212 (1995)). The pendent issue must be essential to the resolution of the issue over which appellate jurisdiction exists. *Swint*, 514 U.S. at 51, 115 S. Ct. at 1212. Under Florida law, malicious prosecution requires a plaintiff to prove six elements of which, at most, only two pertain to our qualified immunity analysis. *See Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994) (listing the six factors). Because "we may resolve the qualified immunity issue without reaching the merits" of the malicious prosecution claim, we do not have jurisdiction to entertain the interlocutory appeal. *Harris*, 105 F.3d at 595. Therefore, we dismiss for lack of jurisdiction Bango's interlocutory appeal of the malicious prosecution claim.

### III. Standard of Review

We review a district court's denial of qualified immunity *de novo*, viewing all evidence and drawing all reasonable inferences in favor of the non-moving

7

party.  *Bennett v. Hendrix*, 423 F.3d 1247, 1249 (11th Cir. 2005).  Summary

judgment is appropriate where "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

## IV. Qualified Immunity

Qualified immunity is "an entitlement not to stand trial . . . when a

government actor's discretionary conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

*Koch*, 221 F.3d at 1294 (citation and internal quotation marks omitted).  After the

officer asserting the affirmative defense of qualified immunity demonstrates that

he acted in his discretionary capacity, the burden shifts to the plaintiff to establish a

constitutional violation.  *Bennett*, 423 F.3d at 1250.  Bango acted in his

discretionary capacity as a law enforcement officer; therefore, our analysis focuses

on whether Bango violated clearly established law.  *See Koch*, 221 F.3d at 1294.

We decide whether the facts alleged show a violation of clearly established law by

"(1) defining the official's conduct, based on the record and viewed most favorably

to the non-moving party, and (2) determining whether a reasonable public official

could have believed that the questioned conduct was lawful under clearly

established law."  *Id.* at 1295 (footnote omitted).  The focus of the second step is

8

whether the state of the law at the time gave the officer "fair warning" that his actions were unconstitutional. *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002)).

### A. Constitutional Violation

"The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause." *Id.* at 1083 (citing *Franks v. Delaware*, 438 U.S. 154, 164, 98 S. Ct. 2674, 2681 (1978)). In *Franks*, the Supreme Court noted that the Fourth Amendment assumes that the factual showing to support probable cause is true. 438 U.S. at 164–65, 98 S. Ct. at 2681. Although every statement in an application for a warrant does not need to be objectively accurate, the affidavit must "be truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165, 98 S. Ct. at 2681 (internal quotation marks omitted); *see also Holmes*, 321 F.3d at 1083. The reasoning in *Franks* applies equally "to information omitted from warrant affidavits." *Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997). "[A] warrant violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" *Id.* at 1326–27 (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)). Therefore, an officer will not receive qualified immunity if a reasonable

9

officer should have known that the statements in the affidavit were included with a reckless disregard for the truth or that facts were recklessly omitted from the affidavit supporting probable cause. *See Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).

A law enforcement officer recklessly disregards the truth when he "should have recognized the error [in the warrant application], or at least harbored serious doubts" as to the facts contained therein. *United States v. Kirk*, 781 F.2d 1498, 1503 (11th Cir. 1986). This is especially true when "the inconsistency [gives] the agent[] cause to investigate further." *Id.* Thus when an officer possesses information that would cause a reasonable officer to have *serious doubts* about the identity of a suspect, the officer is required to either take additional steps to confirm the suspect's identity before submitting the warrant application or include the contradictory information in the warrant application. *See Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989); *Kirk*, 781 F.2d at 1503; *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (finding that an officer cannot turn a blind eye to "easily discoverable facts" and "choose to ignore information").

Reviewing the facts of this case, we note that "[i]t is difficult to believe that the surveillance conditions could have been much better." *Kirk*, 781 F.2d at 1502. Despite Bango's clear observation of the suspect's appearance and the wealth of

10

information the suspect willingly gave Bango, the affidavit in support of the arrest warrant only stated that "[t]his subject told us that his real first name was James and he had just gotten out [of] the Palm Beach County Jail for burglary. Checking the booking blotter, we located the subject and confirmed that this name was James Daniels by the booking blotter." The affidavit did not include any of the known information that would suggest that Daniels was not the suspect. For example, Bango did not include that, unlike Daniels, the suspect had specifically stated that he was released from jail the night before. Nor did he mention that, unlike Daniels, the suspect said he went to court that morning. Furthermore, Bango did not include that the suspect claimed that he was still facing a punishment of fifteen years, unlike Daniels who had been sentenced to time served. Additionally, Bango omitted the fact that he and Kabis had twenty minutes of close contact with the suspect in broad daylight and with an unobstructed view of the suspect's face.

The material inconsistencies between the suspect's story and the information in the search results should have led a reasonable officer to harbor serious doubts about the conclusion that Daniels was the suspect on the video tape. *See Tillman*, 886 F.2d at 321; *see also Madiwale*, 117 F.3d at 1327 ("[I]t is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself"

11

(internal quotation marks omitted)).  At the very least, the inconsistencies should have led Bango to investigate further.  *See Tillman*, 886 F.2d at 321 ("Although the law does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person, due process does require that some steps be taken to eliminate doubts concerning identity that exist prior to obtaining the warrant and to arrest." (internal quotation marks omitted)); *Kirk*, 781 F.2d at 1503; *Kingsland*, 382 F.3d at 1229.  Bango and Kabis only relied on the booking blotter information from the last ninety days when they determined Daniels was the suspect.  The officers' independent discovery of Daniels's booking blotter information does not convert their insufficient investigation into a reasonable one.  *See Kirk*, 781 F.2d at 1503 (noting that even though four different officers incorrectly identified a suspect, those officers should have "recognized the error, or at least harbored serious doubts").

The district court found that despite the inconsistencies, Bango and Kabis ignored two other investigative techniques: (1) expanding the booking blotter search to twelve months and (2) calling the local jails for the names of individuals who were released the night before.  The officers chose to ignore these methods despite knowing that a suspect charged with burglary could be incarcerated for more than ninety days.  Either of these avenues of investigation would have

12

included James Reed in the search results.  Most importantly, perhaps, is that both of these investigative techniques were simple, and we have previously held that officers should look into easily discoverable facts.  *See Kingsland*, 382 F.3d at 1229 (finding that information that could be uncovered by searching a truck for drugs and interviewing available witnesses constituted "easily discoverable facts").

Furthermore, time was not of the essence.  The officers knew that they would be waiting months before arresting the suspect, and no evidence of exigency appears in the record.  Therefore, the circumstances surrounding Bango's investigation did not necessitate such a cursory investigation.  *See Tillman*, 886 F.2d at 321 (noting that the officers waited three months before arresting the suspect).  Under the circumstances, Bango could have taken a few more simple steps to verify his identification.  *See Kingsland*, 382 F.3d at 1229 n.10 (noting that an officer is not required to eliminate every theoretical possibility, but an officer may not "turn[] a blind eye to immediately available exculpatory information").  We cannot quarrel with the district court's finding that Bango recklessly omitted material information when he did not take additional steps to verify the suspect's identity or include the inconsistencies in his arrest-warrant application to the judge.

### B. Arguable Probable Cause

Even though Bango recklessly omitted material facts from the affidavit in

13

support of the arrest warrant, he may still be entitled to qualified immunity if there is arguable probable cause for the arrest. *See Madiwale*, 117 F.3d at 1327. To make this determination, we analyze whether "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (explaining that a plaintiff must show that "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff" (quoting *Kingsland*, 382 F.3d at 1232)).

Taking the facts in the light most favorable to Daniels and considering all the facts that Bango knew at the time he obtained the arrest warrant, Bango did not have arguable probable cause when he signed the affidavit. To conduct this analysis we consider the facts in the affidavit (notwithstanding the misidentification) and those facts that were recklessly omitted. *See Kirk*, 781 F.2d at 1505 ("Our inquiry now focuses upon whether the affidavit is sufficient to establish [arguable] probable cause, notwithstanding the misidentification."); *Madiwale*, 117 F.3d at 1327 (taking into consideration the omitted information when deciding if there was arguable probable cause to obtain search warrants). So

14

our circumstances to consider are that a young African American male named James, who referred to himself as "Toe" or "Tobe," sold the officers drugs. During this twenty minute transaction, he admitted that he had been released from jail the night before, went to court that morning and was facing fifteen years for burglary with a firearm and robbery with a firearm. Additionally, the officers found through searching only three months of records on the booking blotter a young African American male named James Daniels. Daniels had been released from jail two days earlier, had not gone to court that morning, and was sentenced to time served for burglary and petit theft.

In analyzing whether there was arguable probable cause, we first note that the misleading information was the only information in the affidavit that tied Daniels to the drug deal; therefore, the omissions were material to a finding of arguable probable cause. *See Kingsland*, 382 F.3d at 1233 (finding it important that the recklessly false statements were "material to a finding of arguable probable cause"). Additionally, the district court found noticeable differences between the suspect's physical characteristics and Daniels's characteristics.[8] The district court specifically noted that "the suspect's nose is broad with a pronounced ridge, while

_____

[8] Daniels's booking blotter photo that the officers used to identify him is not contained in the record on appeal and was not in the record given to the district court. However, the district court found that the four driver's license photographs of Daniels taken between July 2006 and February 2009 were sufficient because Daniels's facial appearance in all four photos was similar.

15

Daniels's nose is relatively narrow and smooth" and "the suspect's ears protrude noticeably away from his head, while Daniels's do not." The state court judge emphasized the same differences when Daniels was acquitted. The physical differences between the men, coupled with the significant discrepancies between the suspect's story and the information about Daniels contained in the booking blotter, lead to the conclusion that no reasonable officer could have concluded that he had arguable probable cause to arrest Daniels in light of *all* of the circumstances known to Bango. Therefore, we affirm the district court's denial of qualified immunity.

## V. Conclusion

We affirm the finding of the district court that Bango should not be granted qualified immunity. We further affirm the finding that, considering all the facts and circumstances known to Bango, no arguable probable cause existed to issue a warrant for Daniels's arrest. Lastly, we dismiss for lack of jurisdiction Bango's interlocutory appeal from the denial of his motion for summary judgment on Daniels's claim for malicious prosecution.

**AFFIRMED IN PART AND DISMISSED IN PART.**

16