Nadine S. KOCH, Dr., Plaintiff–
Appellee,

v.

Edwin A. RUGG, Dr., individually and in his capacity as Vice President of Academic Affairs of Kennesaw State College; Don Forrester, Dr., individually and in his capacity as Acting Dean of the School of Arts, Humanities and Social Sciences of Kennesaw State College, Defendants–Appellants,

No. 98–9337.

United States Court of Appeals,
Eleventh Circuit.

Aug. 11, 2000.

Susan L. Rutherford, State Law Dept., George Weaver, Hollberg & Weaver, Atlanta, GA, for Defendants–Appellants.

Robert B. Remar, Rogers & Hardin, David C. Ates, Marni K. Brown, Parks, Chesin & Miller, P.C., Atlanta, GA, for Plaintiff–Appellee.

Before EDMONDSON and BIRCH, Circuit Judges, and OWENS*, District Judge.

BIRCH, Circuit Judge:

This interlocutory appeal presents the issue of whether this court has jurisdiction to consider the denial of qualified immunity to administrators in a state university system for their decision not to employ a highly qualified Jewish professor for a temporary full-time teaching position over lesser qualified, non-Jewish temporary full-time instructors. In denying qualified immunity to the administrators, the district judge determined that questions concerning the administrators' intentional racial discrimination in filling the temporary faculty positions prevented qualified-immunity protection. Because we lack jurisdiction to consider this interlocutory appeal, we dismiss it and remand the case for further proceedings in the district court.

## I. BACKGROUND

Plaintiff-appellee, Dr. Nadine S. Koch, who is Jewish, was a tenured political science professor at California State University in Los Angeles, when she moved to Atlanta in 1994 following her husband's employment relocation. Dr. Koch took a leave of absence without pay from California State University and sought academic employment in the Atlanta area. From September, 1994, to December, 1994, she was employed as a part-time or temporary professor in the Department of Political Science and International Affairs ("Political Science Department") of Kennesaw State University ("KSU"), a component of the University System of Georgia that is operated by district court defendant, Board of Regents of the University System of Georgia.

In December, 1994, Dr. Christina Jeffrey, a tenured professor in the KSU Political Science Department, took a projected two-year leave of absence following her nomination to be the House of Representatives Historian under Speaker Newt Gingrich. Dr. Koch, who had impressive credentials and experience,[1] was hired as a temporary full-time professor to replace Dr. Jeffrey in the Political Science Department. Dr. Jeffrey's nomination for House Historian was not approved, and she returned to KSU in early 1995 to resume her teaching responsibilities because she was a

---

* Honorable Wilbur D. Owens, Jr., U.S. District Judge for the Middle District of Georgia, sitting by designation.

1. Dr. Koch obtained her Ph.D. degree from Ohio State University in 1985. *See* Deposition of Willoughby Jarrell, former chair of the KSU Political Science Department, at 66–67 (recognizing that, in the academic field, a college or university strives for diversity of faculty degrees to provide different perspectives in the classroom). She taught as an Assistant Professor of Political Science at the University of Texas in San Antonio from 1985 until 1987 and as an Assistant and an Associate Professor of Political Science at California State University in Los Angeles from 1987 until 1994, where she had taught the introductory American Government course for over 13 years. While at California State University, Dr. Koch was recognized for her proficient abilities in teaching the American Government course and was selected to teach honors sections.

Dr. Koch has published several political science articles and made over thirty presentations in the field. The Foundation for the Improvement of Post–Secondary Education selected her to conduct a project designed to improve the introductory American Politics general education course by sensitizing faculty to issues regarding foreign-language students to provide more effective communication with the large number of minority students. Additionally, Dr. Koch has received numerous awards and honors in the political science field.

tenured professor. Consequently, Dr. Koch was no longer needed to replace Dr. Jeffrey for the 1995–1996 school year.

The KSU Political Science Department budget allotted two full-time instructor positions that were filled on a temporary basis annually. For more than three years prior to the 1995–1996 academic year, these positions had been held by Kerwin Swint and Michael Swinford, neither of whom possessed a Ph.D. degree in early 1995, when Dr. Koch applied for one of these positions.[2] Dr. Koch was not selected; Swint and Swinford were rehired for the two temporary full-time teaching positions.

Consequently, Dr. Koch requested a meeting with defendants-appellants Dr. Edwin A. Rugg, Vice President of Academic Affairs, and Dr. Don Forrester, Acting Dean of the School of Arts, Humanities and Social Sciences, concerning her non-selection.[3] She challenged the rehiring of either Swint or Swinford over her because of the KSU three-year policy. This policy provides that the contract of any temporary full-time faculty member who has been employed at KSU for more than three years will not be renewed.[4]

Following this meeting with Dr. Koch, Vice President Rugg met concerning Dr. Koch's complaints with defendant Dr. Helen Ridley, Chair of the Political Science Department,[5] who had selected Swint and Swinford for the two temporary full-time instructor positions in the department.[6] At this meeting, Chair Ridley informed Vice President Rugg that Dr. Jeffrey and former Chair Jarrell had told her "that Nadine was going to sue us and she was

2. Swint and Swinford were employed originally as doctoral students from another Georgia university. Swint received his Ph.D. in August, 1995, and subsequently was hired as a permanent KSU faculty member. Both instructors had taught introductory political science courses at KSU.

3. In this opinion, we reference the implicated academic administrators by their titles at the relevant time.

4. Vice President Rugg announced the three-year policy to all deans and chairs of departments at KSU in April 14, 1991, regulations that stated: "Only with *special permission,* usually involving *exceptional circumstances,* should the same individual fill a permanent budget line on a temporary basis for more than three years.... *Department chairs and deans should have clear understandings with temporary faculty that their status is time-limited and different from 'permanent faculty.'*" R2–25–Exh. D (first and second emphases added). In identical letters dated May 1, 1995, Dr. Willoughby Jarrell, who was Chair of the Department of Political Science from 1983 to 1995, had notified both Swint and Swinford that their employment as temporary full-time instructors at KSU would not be renewed because of the three-year rule:

Recent guidelines from Dr. Rugg's office regarding instructors currently employed in temporary one-year contracts *will not permit renewal of contract if the same individual has filled a temporary position for three years or more.* Only with *special permis-*

*sion,* usually involving *exceptional circumstances,* will any exception be entertained.

*Excellent teaching and service do not fall into the realm of "exceptional circumstances" in this instance.* This policy of non-renewal is directed towards using "temporary" faculty in temporary time frames not confusing their status with permanent faculty. We do not have any permanent positions in the department for which you could compete at this time.

Though we all have known all year long about the slim possibility of renewal of temporary one-year contracts, *it is difficult nonetheless for all affected for the three year rule to be applied for non-renewal for 1995–96.*

Your service to our department has been of high quality and much appreciated....

I regret these circumstances and will continue to recommend you highly and alert you about any job openings of which I become aware.

R2–25–Exh. E (emphasis added).

5. Although she is a defendant in this case, Chair Ridley did not participate in this interlocutory appeal based on qualified immunity.

6. Shortly after former Chair Jarrell issued the notice to Swint and Swinford of the non-renewal of their employment contracts, Dr. Ridley replaced her as Chair of the Political Science Department. After assuming the Chair position, Dr. Ridley decided to retain Swint and Swinford for the two temporary full-time faculty positions over Dr. Koch.

going to join the Jewish group and sue us on the basis of religious discrimination."[7] Deposition of Helen Ridley at 62. Dr. Ridley testified that Vice President Rugg "[j]ust … shook his head" in reaction. *Id.* He also advised her that he was going to re-open the application process for the two temporary full-time Political Science faculty positions and explained that "if we were going to make a mistake, let's make a mistake on bending over backward, to not g[i]ve the appearance that we're being unfair."[8] *Id.*

On June 16, 1995, Vice President Rugg sent a memorandum concerning the selection of temporary Political Science faculty for the 1995–1996 year to Dean Forrester and Chair Ridley. Acknowledging that "the recent selection process at the department and school levels for the filling of the two temporary positions ha[s] been challenged as unfair and unjust," Vice President Rugg explained the selection procedure, including departmental faculty interviews and evaluations, that would be

followed to fill the two temporary full-time positions with two of the three temporary full-time faculty members from the previous academic year.[9] R2–25–Exh. G–1. On June 19, 1995, Chair Ridley sent a memorandum to Dr. Koch, Swint, and Swinford and informed them that the selection process for the two temporary full-time positions had been re-opened because the previous selection had "been challenged as unfair and unjust" and that they were "invited to compete for the two positions" by applying and interviewing with all of the full-time faculty as a group. *Id.* at Exh. H–1. She advised that "[w]ritten evaluations will be collected from all who evaluate credentials and interview the candidates and will serve as supporting documentation for the final selection decisions and subsequent appointment recommendations from the acting chair and interim dean to the academic vice-president." *Id.* at 2.

In discussing the re-opening of the selection process for the temporary full-time

7. At that time, two Jewish faculty members from the Communications Department had announced their intention to sue KSU for discrimination, and one non-Jewish faculty member in the Communications Department had announced her intention to join in the suit based on retaliation.

8. Both Vice President Rugg and Dean Forrester testified concerning the usual process for selection of temporary faculty. The department chair is primarily responsible for hiring part-time and temporary full-time faculty, who are hired for a term "specified in the contract with no permanent commitment"; "the chair is the hiring agent." Deposition of Edwin Rugg at 24, 55; *see* Deposition of Don Forrester at 33 ("[I]t's always the department chair's call as to temporary employees. The department chair makes the recommendations, of course, the dean concurs or doesn't concur, and sends it on to the vice president, who concurs or doesn't concur."). Faculty searches are unnecessary for temporary faculty employment. *See* Deposition of Edwin Rugg at 23–24; Deposition of Don Forrester at 33.

9. In re-opening the selection process, Vice President Rugg directed

the acting department chair and interim dean to start the selection process over with

a clean slate in a modified format for filling the two temporary appointments. In the spirit of openness and fairness, all three individuals who were hired as temporary full-time faculty in 1994–95 should be allowed to compete for the two positions that will be filled on a temporary basis next year. To maximize the openness and fairness of the selection process, I also suggest that: 1) the specific job duties and required credentials for the two positions be stated clearly in writing and given to each of the three candidates; 2) each candidate submit an updated resume and application letter by a specified date for review and evaluation by regular full-time faculty in the department, the acting chair, and the interim dean; 3) each candidate be interviewed by regular full-time faculty in the department as a group, the acting chair, and the interim dean; and 4) written evaluations, preferably on a standardized form, be collected from all who evaluated credentials and interviewed the candidates and serve as supporting documentation for the final selection decisions and subsequent appointment recommendations to me from the acting chair and interim dean.

R2–25–Exh. G at 1–2.

positions with the permanent faculty, Chair Ridley told them that the reason that the process had been re-opened with departmental interviews of the three applicants was because Dr. Koch had complained and there was concern that she might sue.[10] *See* Deposition of Willoughby Jarrell at 72–73. The interviews of the applicants with all the permanent faculty were scheduled on June 29, 1995, and July 3, 1995. Dr. Carol Pierannunzi, a tenured associate professor in the KSU Political Science Department, testified that, at a subsequent departmental meeting, Dr. Jeffrey stated that "we ... were protecting ourselves from lawsuit." · *Id.* at 28. Neither Dean Forrester nor Chair Ridley responded to this statement by Dr. Jeffrey. *See id.* Regarding her reaction to Dr. Jeffrey's comment that Dr. Koch would sue, Dr. Pierannunzi testified: "I stated that Nadine had never said anything like that, never had gone around threatening to sue and I was very irritated about that." *Id.*

The one-page evaluation of each of the three candidates for the two temporary full-time political science positions following their respective interviews provided space for the permanent faculty "to write comments about strengths and weaknesses of the candidates," but the form did not afford them the opportunity to rank the candidates or to address the job description appropriately.[11] *Id.* at 25. Nevertheless, the typically strong, positive comments regarding Dr. Koch from members of the permanent faculty indicate her ranking by them relative to the other two candidates:

Excellent teaching prep & success

Ability to work constructively with students & colleagues

Excellent organization & communication skills

Excellent in research & publications & great writing

She has more knowledge of applying technology & content than other candidates

*Clearly heads & shoulders above the other two candidates as expected because of her rank & experience edge.* Dept. can benefit greatly from having her on our faculty.

R2–25–Exh. I (former Chair Jarrell) (emphasis added).

Dr. Koch's creative teaching methods are very admirable. She brings great strength to KSC in this area especially since the "scaffolding" model obtained FIPSE support.

Dr. Koch appears well qualified for this position.

*Id.* (Dr. Zebich–Knos). In addition to her prior achievements, Dr. Koch's accomplishments in her short time at KSU prior to her application for one of the two temporary full-time positions are noteworthy.[12]

10. Dr. Carol Pierannunzi, a permanent faculty member of the Political Science Department, recalled a meeting of the permanent faculty at which the interviews/meetings with the three applicants were discussed, and they were advised "that the reason for the three meetings was because if ... we didn't have those three meetings that Nadine would sue." Deposition of Carol Pierannunzi at 16.

11. Concerning the inadequacy of the evaluation form, former Chair Jarrell testified:

[I]t seemed to me [the evaluation form] did not really appropriately and in an appropriate manner address the issue of job description.

And plus, it didn't seem to me to be real relevant in terms of the information solicited to the actual candidates and no ques-

tions; in other words, I didn't think the form really fit the process is what I'm trying to say in short.
Deposition of Willoughby Jarrell at 71–72.

12. During her employment at KSU, Dr. Koch applied for a dean's initiative grant to teach a political science course on the Internet. *Cf.* Deposition of Willoughby Jarrell at 38 (testifying that, to the best of her knowledge as former Chair of the Political Science Department, Dr. Jarrell stated that neither Swint nor Swinford applied for a dean's initiative grant during their KSU employment). The course was so successful that a second section was added during the summer of 1995. Dr. Koch also wrote and published an article in the Kennesaw State University Teaching Newsletter addressed to the teaching of the introductory American Government course.

Following the interviews of the three candidates for the two temporary full-time teaching positions, the permanent faculty met with Dean Forrester and Chair Ridley; former Chair Jarrell asked if the faculty could vote on the applicants. This request was denied, and Chair Ridley stated that their "comments would be looked at and that she would make the decision." Deposition of Carol Pierannunzi at 26. In a July 3, 1995, letter to Dean Forrester, four permanent faculty members protested the process used to fill the two temporary full-time positions for 1995–1996 and specifically disapproved the lack of relevant faculty evaluation in the review procedure.[13]

In her 1994–1995 performance evaluation, then Political Science Chair Jarrell evaluated Dr. Koch's performance as a temporary associate professor of political science with other tenured associate professors rather the temporary instructors Swint and Swinford, who were not at the Ph.D. level:

The standards of evaluation I used for your performance were commensurate to those used for other tenured associate professors in our department. Hence, overall your performance was evaluated as meeting expectations for that level of performance. *Other temporary political science professors were at a master's level and were not expected to perform at the level of expectations as your level. If your performance had been assessed on the same basis as the Master's level temps, you would have rated at exceeding evaluations.*

. . . .

. . . Your classroom initiatives are well received by students and reflected in your course evaluations. Your performance exceeds expectations for the quality of your course presentations and pedagogical emphasis on skill building for students.

. . . .

*Overall, your performance meets expectations in every area and warrants high commendation.*

R2–25–Exh. M (emphasis added). Former Chair Jarrell further explained her reasons for evaluating Dr. Koch on a rating scale equivalent to other tenured professors in the Political Science Department:

In terms of her expertise, command of her area, and she was an associate professor level so what I did was I really compared her against the other associate professors in our department for evaluation purposes.

. . . .

*[Swint and Swinford] didn't possess a doctorate.* Kerwin [Swint] was just on the verge of getting his. *There were all kinds of differences. They were both just starting out in the field,* so to speak, so I saw it roughly apples and oranges here. *We had two different categories of people.*

Deposition of Willoughby Jarrell at 88 (emphasis added).

13. The July 3, 1995, faculty letter to Dean Forrester states:

As you know, the full-time tenure track faculty of the Department of Political Science and International Affairs has recently taken part in a process to hire two full-time temporary faculty members from a pool of three applicants. This process is out of keeping with past procedures in which the department chair evaluated and hired applicants to full-time temporary positions without formalized faculty input.

. . . [W]hile there are merits to faculty review of candidates to such positions, we believe that *the process was ill-used in this instance. In particular we object to the haphazard manner in which the faculty were pulled into the process, the lateness of the review of candidates' files and qualifications, the suspense under which applicants were held for several months, the particular method of evaluation and the obvious lack of standards of process or accountability.* In such a process, at least one of the applicants for these positions will have little time in which to make alternate arrangements. *Moreover, little has changed as a result of the process as it was applied in this instance: the department chair has the authority, as always, to determine who to recommend for these positions.*

It is our hope and understanding that this practice will not be precedent setting. We look forward to working with you in more efficacious procedures for our department and our school.

R2–25–Exh.O (first emphasis added). Additionally, former Chair Jarrell testified concerning the selection process for the two temporary full-time positions in the Political Science Department that "the whole process was rather strange. *We had never had a process of this sort and it was sort of hastily put together.*" Deposition of Willoughby Jarrell at 71 (emphasis added). Indeed, Chair Ridley testified that, at her meeting concerning re-opening the application process for the two temporary full-time positions with Vice President Rugg and Dean Forrester: "We said it needed to be done immediately. Time is of the essence and let's move on this." Deposition of Helen Ridley at 64.

On July 5, 1995, Chair Ridley sent a memorandum to Dean Forrester and stated that, after complying with Vice–President Rugg's suggested procedure, which included consultation with the political science faculty, she recommended the appointments of Swint and Swinford for the two temporary full-time positions in the Political Science Department.[14] The virtually unanimous deficiency comment of the permanent political science faculty in evaluating Swinford, however, was that he did not yet have a doctoral degree or a projected date for obtaining it.[15] Following Chair Ridley's recommendations, Vice President Rugg and Dean Forrester approved hiring Swint and Swinford for the two temporary full-time positions in the Political Science Department.

In the course of this litigation, Chair Ridley has justified her recommendations of Swint and Swinford on the basis of their being more qualified than Dr. Koch for the one-year, temporary full-time position with apparent disregard for the three-year limitation on the continued employment of temporary instructors.[16] Chair Ridley also testified that she had an obligation to give

---

**14.** The memorandum regarding "Appointment of Temporary Faculty in Political Science for 1995–1996" states:

> Having followed the procedure suggested by the Academic Vice–President for filling the two one-year temporary positions in Political Science:
> I recommend, after consultation with the political science faculty, the appointment of *Kerwin Swint* as an Assistant Professor in Political Science (he will receive his Ph.D. in August from Georgia State University) and the reappointment of *Michael Swinford* as an Instructor in Political Science for the year 1995–1996. It is my opinion and that of the members of this department that both persons are highly qualified for these positions.

R2–25–Exh. P.

**15.** Representative comments on the permanent faculty evaluations concerning Swinford's qualifications for one of the two full-time temporary positions noted his lack of a doctoral degree:

> Although not a qualification—one can't help noting lack of completed degree....

R2–25–Exh. J (Dr. Jeffrey).

> While his service is outstanding his professional qualifications represent a weak area for Mike. He has yet to defend his prospectus/dissert. proposal which was disappointing for me to learn.

*Id.* (Dr. Zebich–Knos).

> *We do not need any more master's level instructors when we can get PhD's.*

*Id.* (former Chair Jarrell) (emphasis added).

> Needs to focus more on finishing dissertation.

*Id.* (Dr. Hanks).

> No PhD

*Id.* (Dr. Bush).

> Need to concentrate more effort on completing Ph.D dissertation.

*Id.* (Dr. Akinyeuin).

> Not yet finished with Ph.D.

*Id.* (Dr. Pierannunzi).

**16.** At her deposition, Chair Ridley testified as follows regarding the qualifications of Swint and Swinford in comparison to Dr. Koch:

> Q. Okay. *If you look at Swinford and Swint and Koch's—strictly their qualifications who is more qualified for the one year position?*
> A. *Swinford and Swint.*
> Q. And why?
> A. We had at that time two instructors in Political Science. The job description was to teach introductory courses each quarter.
> Q. Okay.
> A. This is what these guys had been doing. *Koch's qualifications were outstanding qualifications but not more qualified than these guys for this job.* We're talking about a particular—for one year, a particular, narrow area.
> Q. So do you know how long Koch had taught the introductory Political Science course?
> A. *I know Dr. Koch had taught Introductory Political Science courses for a long time. I know Dr. Koch was very good.* I have no objection. *I certainly wouldn't sit here and say that she wasn't.*
> We have a course called American Government in a Global Perspective, as Don [Forrester] pointed out to you, has a Georgia component in it, has a International component in it. This is what they had been teaching, they had been doing an outstanding job.
> . . . .
> Q. I'm asking *strictly qualifications?*
> A. Qualifications for what?
> Q. *To teach the introductory Political Science course, who was more qualified?*
> A. *I said the other two.*
> Q. Okay.
> A. In the sense that *they had been teaching that exact course for all that length of time.*

Deposition of Helen Ridley at 30–32 (emphasis added). Chair Ridley also testified that Swint and Swinford "had been teaching the

KSU students the best possible education by hiring the most qualified faculty and that knowledge of subject matter was "critical."[17] Deposition of Helen Ridley at 92. Chair Ridley admitted that someone who had a doctoral degree[18] and had taught the introductory Political Science course for fourteen years not only had more knowledge of the material but also had more experience in communicating or teaching the subject to students than an instructor who had taught the course for four or five years.[19] See id. at 36–38. She further conceded that the introductory political science class at KSU "[s]hould not be" difficult for someone with a doctoral degree in political science to teach, particularly after fourteen years of teaching political science. Id. at 39.

Dean Forrester also testified about the important considerations of prior teaching and publication in hiring decisions for fac-

ulty. See Deposition of Don Forrester at 13–14. Regarding a temporary full-time candidate, he explained that the objective was "to get the best teacher for that year you can ... we want to get the best teacher for the purpose we're seeking, for the role we're seeking to fill." Id. at 14 (emphasis added). Concerning the employment of Swint and Swinford over Koch, Forrester nonetheless testified that the Political Science Department "had the need for people who could teach the basic required Political Science course, core course, who had experience and success in doing it and these people had." Id. at 24. Although part of Dean Forrester's justification for hiring Swint and Swinford over Dr. Koch was that the KSU introductory political science course had a Georgia component which they had taught, he testified that he did not know how much of the course was devoted to the Georgia component or even the substance of it.[20] See id.

---

actual class, what we needed for one year ... for ... *three and four years.*" *Id.* at 40 (emphasis added). Additionally, defendants-appellants' response to Dr. Koch's Interrogatory 11 explained the selection of Swint and Swinford on the basis of their record of having taught the introductory political science course at KSU:

Dr. Ridley recommended Swinford and Swint as the two persons best able to meet the needs of the Department for 1995–1996. *The job description,* which mirrored the needs of the Department for 1995–1996, *called for teaching* of POLS 201, *the introductory political science course* and for limited additional departmental responsibilities. *Both Swinford and Swint had been performing this job effectively and responsibly for a number of years.* They both were experienced instructors, popular with the KSU students, who had given loyal and faithful service to the University and the Department; *they were proven and highly qualified faculty for the positions.* Dr. Ridley had no doubt that they would continue to provide a high calib[er] of service to the department and they have done so. Since no changes in job requirements for temporary faculty were anticipated for 1995–1996, *Dr. Ridley and KSU believed that the appointment of Swint and Swinford would best serve the needs of the Department.*
R2–25–Exh. B–13–14 (emphasis added).

**17.** Former Chair Jarrell testified that publications evidence familiarity with subject matter

and "always enhance[ ] a professor." Deposition of Willoughby Jarrell at 23.

**18.** Dr. Pierannunzi testified that, even for a one-year teaching position, an applicant with a doctoral degree is more attractive than one without that degree: "This is an institution that awards degrees so if we didn't value degrees, we would get out of this business.... [A] degree is better than no degree to an institution that gives degrees." Deposition of Carol Pierannunzi at 31.

**19.** Dr. Pierannunzi testified that teaching methodology or pedagogy "obviously" was a factor in hiring a faculty member. Deposition of Carol Pierannunzi at 13.

**20.** Dr. Pierannunzi, who has authored a book on Georgia politics, testified regarding the content of the introductory political science course, including the Georgia component, that was to be taught by the two applicants selected for the temporary full-time positions:

Q. The first year course that whoever was selected was going to be teaching is an introductory course?
A. Right.
Q. What ... is the content of that course?
A. It's basic American Government, a week on the Congress, a week on the Judiciary, a week on the Presidency, a week on Participation, a week on Voter and Public Opinion. It's just—

at 26. When Dr. Koch's fourteen years of teaching introductory political science was contrasted with Swint and Swinford's three to four years of teaching the course at KSU, Dr. Forrester testified: "I don't know that the number of years is that crucial. *They needed someone who could teach low level courses successfully* and these were *proven entities." Id.* at 26 (emphasis added).

Although Dean Forrester conceded that hiring Dr. Koch would not have violated the three-year rule, which did not exempt an instructor for excellence in teaching, he adhered to his justification that Swint and Swinford had proven their ability to teach the introductory political science course. *See id.* at 24–25. Dean Forrester was questioned about the *inconsistency* of hiring Swint and Swinford because they had proven their ability to teach the introductory political science course in view of the three-year limitation on renewing the contracts of temporary faculty:

> Q. Well, wouldn't that be a justification for going beyond the three years in every situation every time you have a three-year professor bumping up against that rule, the department can always turn around and say they have done it successfully for three years and there is our need and so we're going to extend them?

> Q. *Would you say it's a standard course that's taught at probably every college and university that has a Political Science department?*
> A. *Absolutely, every one.*
> Q. And there is a section or a small part concerning Georgia, isn't there, or is there?
> A. I'm under oath. There is supposed to be.
> Q. But the fact of it is—
> A. I'm the only one that teaches anything about Georgia.
> Q. And you're aware that all the others just skip over that?
> A. Yeah. Well, I don't know that that's true. I mean, I suppose that they teach some little bit, but many of the faculty who teach that are experts in international relations, so I would suspect their knowledge of Georgia Politics is minimal.
> . . . .

> A. *I suppose you could make a case for that. The fact is we try very hard not to extend people beyond three years. It's as much for the individual as for the university.*
> Q. In you[r] honest opinion do you think the department tried very hard in this situation not to extend either Swinford or Swint beyond three years and offer the position to Dr. Koch?
> A. *I don't know the answer to that.*

*Id.* at 26–27 (emphasis added). Dean Forrester further testified that he was aware that the reason for re-opening the selection of temporary faculty for the Political Science Department was because of the concern that Dr. Koch would file a discrimination suit. *See id.* at 36–37. After going through the re-selection process, including the departmental interviews and evaluations, Dean Forrester testified: "We went away and essentially the burden of making the decision was placed back on the shoulders of the chair and the dean, which is where it belonged to begin with."[21] *Id.* at 38.

Vice President Rugg testified that teaching experience is taken into consideration in comparing candidates for faculty selection. *See* Deposition of Edwin Rugg at 52. In the re-opening of the selection process, Vice President Rugg explained that he wanted the department involved "[i]n the

> Q. Would it be your belief that *any Ph.D., Political Science professor from any other state could walk in to a first year class and within two hours, three hours, prepare to teach the Georgia portion of it?*
> . . . .
> A. *Yes.*
> Deposition of Carol Pierannunzi at 21–23 (emphasis added).

**21.** Dr. Pierannunzi testified that the participation of the department faculty members in the re-opening of the selection process for the temporary full-time positions was "a waste of time" because the standard selection process had not changed or been influenced by the participation of the departmental faculty: the final selection "was the chair's decision before the meetings, it was the chair's decision after the meeting." Deposition of Carol Pierannunzi at 20.

same manner they would have been involved if we were hiring a permanent position, *although this was really a restricted search to the three internal candidates*" because "there [wa]s no mandate for Nadine Koch over Kerwin Swint or the other person [Swinford]." *Id.* at 54–55, 56 (emphasis added). As to the final recommendation of Swint and Swinford over Dr. Koch by Dean Forrester and Chair Ridley, Vice President Rugg testified that, while it appeared that all three candidates could teach the introductory political science course,

> Swint and Swinford had been doing this job ... for a couple of years or more and had proven themselves very effective in it. That had not necessarily been the case with Nadine.
>
> She had only been with us full-time for six months, so they didn't have the personal depth of experience with her as they did with the other two.... [O]ther than the fact that these people all could

do the job, these two had been doing it and doing it well and there was no reason to select one over the other.

> And so their inclination was to go forward with the two individuals who had held that position the previous year. *Id.* at 56–57.

Vice President Rugg's memorandum establishing the three-year limitation on the employment of temporary faculty announces a policy to KSU deans and department chairs. *See* R2–25–Exh. D; *supra* note 4. In contrast to this policy or rule so accepted by the deans and chairs,[22] Vice President Rugg characterized it at his deposition as only a "guideline," to which "convincing" exceptions could be made.[23] *Id.* at 48. Significantly, Vice President Rugg did not consider the higher salary that Dr. Koch's credentials and experience would have commanded over Swint and Swinford to have been a factor involved in the selection process because obtaining the additional funds for this temporary position apparently was not an obstacle.[24]

---

22. We note the former Chair Jarrell letters informing Swint and Swinford that they could not be re-employed after three years because of this policy despite their fine performance. *See supra* note 4.

23. In characterizing the three-year limitation on employment of temporary KSU faculty as a "guideline," Vice President Rugg testified:
It wasn't a rule, it was a guideline to begin with, and guidelines are things we try to follow. It was an attempt to try to clarify for all concerned that we needed to be on a more distinguishing path between temporary and permanent faculty and that included in our handling of salary increases, recommendations, et cetera.
And again, there was no hard and fast rule here. It was a guideline and exceptions would be made if the exceptions were presented to me in a convincing way.
Deposition of Edwin Rugg at 48.

24. Vice President Rugg testified that
if Dr. Koch had been selected, we would have probably had to find more money and changed the title of the position to reflect her credentials, we were willing—and I told Dr. Forrester and Dr. Ridley ... if in an open competition of these three individuals for the two positions Dr. Koch was perceived to be the stronger candidate, then we would go ahead under the circumstances and find the additional money and

make the additional change in rank for the one year even though it's only temporary.
. . . .
[O]ur standing practice, again, in fairness and to avoid litigation, is that if we're going to call an assistant professor who works with us part-time, if we're going to give an individual an assistant professor rank who teaches a course a quarter for us because they have the doctorate doctoral, we're going to call that person an[ ] assistant professor instead of instructor, we're certainly going to provide the same courtesy as a full-time temporary person.
. . . .
We [Vice President Rugg, Dean Forrester, and Chair Ridley] talked about the dilemma because the perception was that we had two instructor [salary] lines and we didn't have an associate professor line, and I said well, *I'll find the money to make an associate professor line if that's what we need to do, if that's the better qualified person for the job that needs to be done.*
Deposition of Edwin Rugg at 50, 51 (emphasis added). Analogizing the situation where a search committee, with the concurrence of the department chair, decides or recommends an associate professor for an assistant professor position, Chair Ridley testified that she "could go plead the case to the dean and the vice president to see if they'd up the ante." Deposition of Helen Ridley at 77.

Following the re-hiring of Swint and Swinford for the two temporary full-time positions in the KSU Political Science Department pursuant to the re-application process, Dr. Koch filed suit in federal court and alleged religious discrimination in violation of Title VII, 42 U.S.C. § 2000e, racial discrimination in violation of 42 U.S.C. § 1981, and denial of equal protection in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.[25] The individual defendants moved for summary judgment based on qualified immunity. The magistrate judge to whom the case was referred recommended that qualified immunity be denied to all of the individual defendants. Regarding Vice President Rugg and Dean Forrester, the magistrate judge explained that "the facts show that Forrester and Rugg, upon Ridley's recommendation, hired Swinford and Swint" and that "[w]hile the facts supporting [Dr. Koch's] allegations of discrimination may be weaker against Forrester and Rugg" than Chair Ridley, qualified immunity also was inapplicable to them. R3–31–13. The district judge followed the magistrate judge's recommendation and denied qualified immunity to the individual defendants. In this interlocutory appeal, Vice President Rugg and Dean Forrester contest their denial of qualified immunity.

## II. DISCUSSION

The affirmative defense of qualified immunity is " 'an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal [immunity] question,' " *Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 838–39, 133 L.Ed.2d 773 (1996)

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)) (alteration in original), when a government actor's discretionary "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because qualified immunity usually protects individual government and public employment actors from civil damages suits, *see Lassiter v. Alabama A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc), a district judge's denial of this affirmative defense is an immediately appealable collateral order, *provided that it concerns solely the pure legal decision of (1) whether the implicated federal constitutional right was clearly established and (2) whether the alleged acts violated that law*, *see Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995)[26]; *McMillian v. Johnson*, 88 F.3d 1554, 1562 (11th Cir.), *amended on reh'g on other grounds*, 101 F.3d 1363 (11th Cir.1996) (per curiam); *see also Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738 ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."). To be reviewable, a pretrial qualified immunity appeal must present a legal question concerning a clearly established federal right that can be decided apart from considering sufficiency of the evidence relative to the correctness of the plaintiff's alleged facts. *See Johnson*, 515 U.S. at 313–15, 115 S.Ct. at 2156–57; Fed.R.Civ.P. 56(c)

25. The Title VII claim alleging religious discrimination was pled against the University System of Georgia Board of Regents and KSU only; KSU subsequently was dismissed as an improper party. The district judge granted summary judgment to the Board of Regents as to monetary damages under 42 U.S.C. §§ 1983 and 1981 based on Eleventh Amendment immunity and also granted summary judgment to the individual defendants in their official capacities for money damages. The district judge further granted the individual defendants' summary judgment as to the Title VII claims and denied them summary judgment on the § 1983 and § 1981 claims. For her lost wages, pain and suffering, and emotional distress, Dr. Koch seeks $500,000 compensatory damages on her § 1981 and § 1983 claims and punitive damages of not less than $500,000.

26. *"Johnson* ... applies only to interlocutory review, not to appellate review following final judgment." *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir.1996).

(stating that summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law").

■ "The subjective intent of government actor defendants plays no part in qualified immunity analysis"; "[o]bjective legal reasonableness" is the determinative standard. *Lassiter*, 28 F.3d at 1150; *see Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (noting that a government actor's subjective beliefs about the legality of his conduct are irrelevant to qualified immunity analysis); *Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) (recognizing that qualified immunity is evaluated under a *purely objective standard* without consideration for the government actor's subjective belief). While evidence of improper motive is irrelevant to qualified immunity analysis, "it may be an essential component of the plaintiff's affirmative case." *Crawford–El v. Britton*, 523 U.S. 574, 589, 118 S.Ct. 1584, 1592, 140 L.Ed.2d 759 (1998).[27] As supervising administrators, Vice President Rugg and Dean Forrester contend that there is no evidence concerning their alleged discriminatory intent in the decision not to hire Dr. Koch for the temporary full-time faculty position in the Political Science Department. Like *Johnson*, this statement of their pretrial, qualified immunity appeal implicates examination of circumstantial evidence and places the threshold question of our jurisdiction at issue. *See Mueller v. Tinkham*, 162 F.3d 999, 1002 (8th Cir.

1998) ("We have jurisdiction to review the denial of summary judgment based on qualified immunity, but that jurisdiction is limited to abstract issues of law and does not extend to arguments concerning the sufficiency of the evidence."); *see also GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir.1998) (recognizing that pretrial appellate jurisdiction in cases where qualified immunity is denied extends solely to legal "issues concerning whether [the] complaint sufficiently alleged the violation of a clearly established right").

■ Our jurisdiction to review a denial of qualified immunity depends on the type of issue involved. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1484 (11th Cir. 1996). The first type occurs when the appellate question involves legal issues underlying the qualified immunity determination or "core qualified immunity" analysis. *Id.* When an individual defendant moves for summary judgment based on qualified immunity, a district judge "must determine whether there is a genuine issue of material fact as to whether the defendant committed conduct that violated clearly established law." *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir.1996). This decision involves a two-part analysis: (1) defining the official's conduct, based on the record and viewed most favorably to the non-moving party,[28] and (2) determining whether a reasonable public official could have believed that the questioned conduct was lawful under clearly established law. *See id.; Mencer v. Hammonds*, 134 F.3d 1066, 1070 (11th Cir.1998), *cert. denied*, 525

27. *"Crawford–El* drew a fine line between the role of subjective intent with respect to the *affirmative defense* of qualified immunity—where it is irrelevant—and the role of subjective intent with respect to the elements of a *constitutional violation*—where it remains a vital element of certain civil rights suits." Lisa R. Eskow and Kevin W. Cole, *The Unqualified Paradoxes of Qualified Immunity: Reasonably Mistaken Beliefs, Reasonably Unreasonable Conduct, and the Specter of Subjective Intent That Haunts Objective Legal Reasonableness*, 50 Baylor L.Rev. 869, 893 (1998); *see Foy v. Holston*, 94 F.3d 1528,

1533, 1535 n. 8 (11th Cir.1996) (stating that "[a] decision on qualified immunity is separate and distinct from the merits of the case" but also recognizing that qualified immunity is not lost "whenever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort").

28. When we, like the district judge, view the facts for summary judgment purposes most favorably to the plaintiff, "a pure issue of law is created." *Cottrell*, 85 F.3d at 1486 n. 3.

U.S. 982, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998).

"*Johnson* establishes only that a plaintiff may not base an interlocutory appeal on the district court's first determination *by itself*." *Mencer,* 134 F.3d at 1070. When *both* core qualified immunity issues are involved, we have jurisdiction for *de novo* review because that resolution "constitutes a final, collateral order." *Johnson,* 74 F.3d at 1091; *see Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817; *Gonzalez v. Lee County Housing Auth.,* 161 F.3d 1290, 1294 (11th Cir.1998). " '[A] qualified immunity ruling . . . is . . . a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.' " *Johnson,* 515 U.S. at 313, 115 S.Ct. at 2156 (citation omitted) (omissions in original); *see also Moniz v. City of Fort Lauderdale,* 145 F.3d 1278, 1281 (11th Cir.1998) ("[A] denial [of qualified immunity] remains immediately appealable to the extent that it turns on 'an "abstract issu[e] of law" relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was "clearly established." ' " (first and second alterations added) (citation omitted)).

 In contrast, the second type of appellate issue presented in the qualified immunity context challenges only sufficiency of the evidence relative to a "predicate factual element of the underlying constitu-tional tort." *Dolihite v. Maughon ex rel. Videon,* 74 F.3d 1027, 1033 n. 3 (11th Cir. 1996); *see Cottrell,* 85 F.3d at 1484. We lack jurisdiction for these appeals regarding solely evidence sufficiency because they are not immediately appealable final decisions since they involve the determination of "facts a party may, or may not, be able to prove at trial." *Johnson,* 515 U.S. at 313, 115 S.Ct. at 2156; *see Vista Community Servs. v. Dean,* 107 F.3d 840, 844 (11th Cir.1997); *McMillian,* 88 F.3d at 1563. Such factual sufficiency challenges are distinct from "evidentiary sufficiency issues that are part and parcel of the core qualified immunity issues, i.e., the legal issues." *Cottrell,* 85 F.3d at 1486; *see Mencer,* 134 F.3d at 1069 ("[T]he court did not deny [defendant] qualified immunity based only on 'evidence sufficiency' but on its belief that a reasonable person in [defendant's] position would have known his conduct violated clearly established law."). The denial of qualified immunity is "purely legal where it concerns only the application of established legal principles to a given set of facts," which enables appellate jurisdiction, and "not 'legal' where it resolves a fact-related dispute of 'evidence sufficiency.' " *Steadman v. Texas Rangers,* 179 F.3d 360, 365 (5th Cir.1999) (quoting *Johnson,* 515 U.S. at 313, 314, 115 S.Ct. at 2156–57), *cert. denied,* —— U.S. ——, 120 S.Ct. 933, 144 L.Ed.2d 812 (2000).[29]

**29.** We want to be clear that appeals from cases like this one, where we lack appellate jurisdiction because only evidence insufficiency is asserted, are distinct from appeals in cases where core qualified immunity issues properly are presented for our review. In appeals challenging only sufficiency of the evidence, the Supreme Court and implementing cases in our circuit have held that there is no appellate jurisdiction. *See Johnson,* 515 U.S. at 313, 115 S.Ct. at 2156; *Vista Community Servs.,* 107 F.3d at 844; *McMillian,* 88 F.3d at 1563; *Johnson,* 74 F.3d at 1091. By contrast, in appeals involving core qualified immunity issues, where we determine whether specific governmental conduct violates clearly established law, we may consider lawful and unlawful motives of government actors to the extent that such motivations are part of the qualified immunity determination of pre-existing law. Therefore, the decision in this case neither involves nor limits *Foy* or its progeny. Because Vice President Rugg and Dean Forrester have asserted evidence insufficiency only, we lack appellate jurisdiction. This case properly proceeds to trial in district court where a jury may reject their "proffered non-discriminatory reasons for [their] employment decisions" and instead may determine that they "intentionally made race-based employment decisions." *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1321 (11th Cir.2000) (explaining that *Foy* is inapposite in cases, where, following a trial, the jury found that the defendant acted with discriminatory intent and also unambiguously and totally rejected the defendant's claimed nondiscriminatory motives and reasons for the employment action).

■ The Supreme Court has clarified "that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." *Behrens*, 516 U.S. at 313, 116 S.Ct. at 842; *see Crawford–El*, 523 U.S. at 595, 118 S.Ct. at 1595 (recognizing that the Court "declined to craft an exception to settled rules of interlocutory appellate jurisdiction and rejected the argument that the policies behind the [qualified] immunity defense justify interlocutory appeals on questions of evidentiary sufficiency"). In a factual situation analogous to *Johnson*, we declined to exercise appellate jurisdiction when the government actor's only argument regarding qualified immunity is that the record does not support discriminatory intent. *See Ratliff v. DeKalb County*, 62 F.3d 338, 341–42 (11th Cir. 1995) (gender discrimination). When discriminatory intent is a predicate factual element of the underlying constitutional tort,[30] we have recognized that sufficiency of discriminatory-intent evidence generally is not part of the core qualified immunity analysis. *See Dolihite*, 74 F.3d at 1033–34

n. 3 (Eighth Amendment); *Crawford–El*, 523 U.S. at 592, 118 S.Ct. at 1594 ("The immunity standard in *Harlow* itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law."). In deciding whether jurisdiction is appropriate in a case where the interlocutory appeal is based on qualified immunity, we do not consider facts that the parties might prove at trial but whether the government actors' undisputed conduct, analyzed objectively, violates clearly established law. *See Johnson*, 515 U.S. at 311, 115 S.Ct. at 2155 (excessive force); *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir.2000) (excessive force).

■ In this case, Dr. Koch has alleged racial discrimination by Vice President Rugg and Dean Forrester in their decision to accept Chair Ridley's recommendation to hire Swint and Swinford instead of her for the temporary full-time positions in the Political Science Department. To prevail at trial, Dr. Koch would have to prove intentional or subjective racial discrimination in this employment decision by Vice President Rugg and Dean Forrester, which is prototypically a factual determination derived from circumstantial evidence by the trier of fact.[31] Thus, "evi-

---

**30.** The Court also has explained that "[w]hen intent is an element of a constitutional violation ..., the primary focus is not on any possible animus directed at the plaintiff; rather, it is more specific, such as an intent to disadvantage all members of a class that includes the plaintiff." *Crawford–El*, 523 U.S. at 592, 118 S.Ct. at 1594. Additionally, "with certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation." *Id.* at 593, 118 S.Ct. at 1594.

**31.** Our court has recognized that the analytical structure in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for a prima facie case of Title VII employment discrimination based on circumstantial evidence also is applicable to a claim of racial discrimination under § 1983. *See Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir.1982). The Supreme Court has clarified that the defendant employer's production of a nondiscriminatory reason for its action, irrespective of credibility, satisfies its burden of production and reduces the case for the trier of fact to determining "the ultimate question" of whether the plaintiff has

proved intentional racial discrimination by the defendant employer. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see Batey v. Stone*, 24 F.3d 1330, 1334 n. 12 (11th Cir. 1994). Thus, the burden of persuasion of intentional racial discrimination remains with Dr. Koch.

Among the reasons given by Vice President Rugg and Dean Forrester for accepting Chair Ridley's recommendation and hiring Swint and Swinford for the temporary full-time position teaching the introductory political science course were that Dr. Koch was overqualified for the position, the two incumbents had performed satisfactorily, and they were familiar with the Georgia component of the course. Dr. Koch maintains that these reasons were a pretext for the administrators' actual racially discriminatory impetus, shielded by the re-application procedure, which she alleges was a ruse to avoid a lawsuit by her. At trial, Dr. Koch would have the opportunity to present her qualifications, including her doctoral degree, 14 years of teaching experience, and expertise in teaching the introductory political science course; the KSU three-

dence of improper motive" is an "essential component" of Dr. Koch's "affirmative case" for trial. *Crawford–El,* 523 U.S. at 589, 118 S.Ct. at 1592. Because Vice President Rugg and Dean Forrester have based their interlocutory appeal from denial of qualified immunity solely on the lack of evidence to show racially discriminatory intent in their decision not to hire Dr. Koch for the temporary full-time position, a critical element of the principal case for trial rather than core qualified immunity issues,[32] we lack jurisdiction.

### III. CONCLUSION

On interlocutory appeal, Vice President Rugg and Dean Forrester challenge their denial of qualified immunity because they contend that there is no evidence to show that they were motivated by racial discrimination in their participation in the decision not to hire Dr. Koch for a temporary full-time position in the KSU Political Science Department. Instead of stating their appellate issue in qualified immunity terms and addressing their affirmative defense with respect to the applicable clearly established law, they have presented the factual issue of no evidence to show their discriminatory intent to commit a constitutional tort. Because we lack jurisdiction, we DISMISS this appeal and REMAND

the case for further proceedings in the district court.

year limitation on the employment of temporary faculty established by Vice President Rugg, which was applicable to Swint and Swinford; Chair Ridley's testimony regarding the reaction and comments by Vice President Rugg when informed of the possibility of Dr. Koch's joining other Jewish faculty in suing KSU for discrimination; the unusual and ineffective faculty participation in the evaluation of the applicants; and their reaction to this process. The trier of fact then would decide which reasoning was persuasive and, accordingly, if Vice President Rugg and Dean Forrester had engaged in intentional discrimination in deciding to accept Chair Ridley's decision not to hire Dr. Koch for a temporary full-time position in the Political Science Department.

32. Regarding qualified immunity analysis with respect to clearly established law concerning the asserted race discrimination in this case, we note that race discrimination

was prohibited in public employment well before the challenged employment decision relating to Dr. Koch. *See Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976); *Busby v. City of Orlando,* 931 F.2d 764, 775 (11th Cir.1991) (per curiam); *see also Lassiter,* 28 F.3d at 1149 ("For the law to be clearly established to the point that qualified immunity does not apply, the law must have *earlier* been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." (citation omitted) (emphasis added)). Additionally, the Supreme Court has held that Jewish persons are protected under 42 U.S.C. § 1981. *See Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 611–12, 107 S.Ct. 2022, 2027, 95 L.Ed.2d 582 (1987); *accord Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1987).